PER CURIAM:
 

 Appellants appeal from a judgment of the United States Claims Court
 
 [1]
 
 denying appellants’ claim for environmental differential pay under 5 U.S.C. § 5343(c)(4).
 
 [2]
 
 We affirm.
 

 
 *1384
 

 Background
 

 Appellants are 47 present or former wage grade employees at the Aerospace Guidance & Metrology Center (AGMC), Air Force Logistics Command, Newark Air Force Station, Newark, Ohio, an Air Force facility responsible for the rehabilitation, testing, and repair of inertial guidance and navigational systems. Appellants brought this action in the United States Court of Claims (now the U.S. Claims Court) seeking to recover retroactive environmental differential pay (EDP) for performance of duties allegedly involving “unusually severe working conditions or unusually severe hazards” within the meaning of 5 U.S.C. § 5343(c)(4)
 
 [3]
 
 from November 1, 1970.
 

 Of the 47 appellants, eight are instrument mechanics who seek EDP for micro-soldering work. A boiler plant operator seeks EDP for dirty work. Four appellants who worked with dimethylsulfoxide (DMSO) claim EDP for exposure to explosives and incendiary materials. Finally, claims to EDP for exposure to toxic chemicals are made by twelve other instrument mechanics who cleaned and repaired instruments, by eight appellants who worked with or near beryllium, and by four inspectors, four welders, four electroplaters, and two others who worked with DMSO.
 

 The Office of Personnel Management has issued regulations defining and specifying the hazards for which EDP is payable. Subchapter S8-7, Federal Personnel Manual Supplement 532-1, Appendix J. Appellants say their duties fall within the categories identified in Appendix J.
 

 The trial judge determined that appellants were not exposed to working conditions or hazards of an “unusually severe” nature within the meaning of § 5343, and did not work under conditions described in Appendix J. Accordingly, he denied appellants’ claims for EDP.
 

 Issue
 

 Whether the trial judge erred in denying appellants’ claims for EDP.
 
 [4]
 

 OPINION
 

 The categories listed in Appendix J are: (1) Micro-soldering; (2) Dirty Work; (3) Explosives and Incendiary Materials; and (4) Poisons (Toxic Chemicals).
 

 (1)
 
 Micro-soldering
 

 Paragraph 8, Part I, Appendix J provides a differential for:
 

 8.
 
 Micro-soldering or wire welding and assembly.
 
 Working with binocular-type microscopes under conditions which severely restrict the movement of the employee and impose a strain on the eyes, in the soldering or wire welding and assembly of miniature electronic components.
 

 Each of the eight appellants asserting a claim under that paragraph worked with a binocular-type microscope and micro-soldering tools.
 

 The trial judge denied these appellants EDP because they were not required to look through the microscope for a continuous prolonged period, but were free to look away and to rest their eyes essentially at
 
 *1385
 
 will. Appellants say that under such a standard no entitlement to EDP would arise unless employees’ heads were strapped to the microscope. They say employees spend substantial time looking into the microscopes and must sit in one place, and that their movement is therefore restricted within the meaning of Appendix J. Appellants also challenge the trial judge’s conclusion that the work does not impose a strain on the eyes.
 

 The trial judge’s findings are, however, amply supported in the record. Dr. Halveston, the government’s expert witness, testified that microscope usage at AGMC neither severely restricts movement nor imposes a strain on the eyes, and the trial judge accepted that testimony. That appellants’ expert offered conflicting testimony is alone no basis for upsetting the trial judge’s findings.
 

 (2)
 
 Dirty Work
 

 EDP for dirty work is payable only for duty that produces a soiling of body or clothing “beyond that normally to be expected in performing the duties of the classification.” Part I, paragraph 4, Appendix J.
 

 Appellant Williams claims EDP for his work in cleaning gas-fired boilers. The trial judge found that Williams did not perform “work which subjected him to soil . .. beyond that normally to be expected.”
 

 Williams says he should have been awarded EDP because the dirt exceeded that produced by normal performance of duties and because boiler plant operators performing similar duties at other Air Force facilities are paid EDP.
 

 The record shows that Williams wore protective outer garments while performing his duties; that neither the clothing he wore under those garments nor his skin was unduly soiled at the end of an ordinary work day; and that washroom facilities were available and reasonably effective in removing dust at the end of the day. That other employees at other facilities cleaning other boilers were entitled to EDP for dirty work is not controlling. No basis appears in the record, therefore, for reversal of the trial judge’s denial of EDP to Williams.
 

 (3) and (4)
 
 Explosives and Incendiary Materials and Poisons (Toxic Chemicals)
 

 Those appellants seeking EDP for exposure to explosives, incendiary materials, and toxic chemicals, do so on the basis of Paragraphs 2, 3, 4, and 5, Part II, Appendix J,
 
 [5]
 
 citing their work with DMSO, expo
 
 *1386
 
 sure to cleaning solvents (principally Freon, ethyl alcohol, and acetone), performance of electroplating and welding duties, and exposure to beryllium dust.
 

 The trial judge determined that the risk of injury to those appellants had been “practically eliminated” by protective devices and safety measures, noting the safety record at AGMC and the absence of incidents of personal injury since November, 1970.
 

 The EDP categories for explosives and incendiary materials, and for toxic chemicals, are divided into “high degree” and “low degree” hazards. The high degree categories have, since their inception, contained an explicit limitation precluding a pay differential if protective devices and safety measures have “practically eliminated” the potential for serious personal injury. The low degree category did not contain a similar limitation until 1977. Appellants say the pre-1977 low degree category thus requires payment of EDP regardless of the efficacy of protective devices and safety measures.
 
 [6]
 
 We disagree.
 

 Section 5343(c) authorizes EDP only when the duty involves “unusually severe working conditions or unusually severe hazards.” To construe a pre-1977 low hazard category as authorizing EDP where the potential for injury has been practically eliminated would be to elevate the low hazard category above that of the high hazard, and to permit a finding that low hazard conditions were “unusually severe” when, under the same circumstances, a high hazard condition could not be so found. That view would impermissibly extend EDP to situations involving no practical potential for injury and thus no compensable hazard whatsoever, in direct conflict with the statutory provision requiring “unusually severe” hazards. It is axiomatic that courts must interpret statutes, whenever possible, in such manner as to avoid conflict between
 
 *1387
 
 them.
 
 Morton v. Mancari,
 
 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). The more so when a conflict is asserted between a statute and a regulation. In light of these considerations, the 1977 revision must necessarily have been intended to make explicit what till then had been implicit.
 

 Appellants say consideration of AGMC’s safety record is irrelevant and misleading. The attack is unfounded. Each of the involved EDP hazard categories requires that there be a risk of personal injury from the listed hazards before EDP is payable. That AGMC experienced no injuries over a 10 year period is clearly probative of whether the risk of personal injury had been “practically eliminated.” Indeed, the past is prologue. The facts most probative of whether a risk has been practically eliminated by protective devices and safety measures is the track record achieved over time by those devices and measures. The trial judge did not, as appellants assert, look only to actual injury or its elimination. On the contrary, he properly determined that the record reflected the practical elimination of the potential for injury.
 

 Because all life involves some risk, and because a total elimination of all risk may in some instances be impractical, stultifying, or impossible, appellants are able to describe risks of their jobs in general terms, and to argue, in effect, that some potential for injury is present in the performance of those jobs. To stop there, however, is to delete from the applicable statute the provision touching “unusually severe” hazards, and from the regulation the provision touching the practical elimination of the potential for injury. The trial judge committed no error in applying the statutory and regulatory provisions governing decision in this case.
 

 Appellants’ attack on the specific underlying findings of the trial judge makes even more clear the absence of error.
 

 A. DMSO
 

 The six appellants claiming EDP for work with DMSO used a DMSO-nitric acid mixture to remove epoxy from components of inertial guidance systems. The mixture is heated under a ventilator hood to approximately 130° centrigrade. The components are then immersed in or brushed with the heated solution long enough to remove the epoxy.
 

 Appellants say there is a risk of nitric acid bums; that acid fumes are toxic and flammable; and that fires have resulted from handling of the mixture. The trial judge, citing several protective devices (e.g., face masks or goggles, arm-length rubber gloves, rubber apron), found that injuries •had been prevented by those devices, and that the fires were all contained in the ventilator hood. These six appellants offered no evidence of injuries having actually resulted from handling of the mixture over a 10 year period. On appeal they have presented no basis for upsetting the determination of the trial judge.
 

 Four appellants working with DMSO alternatively cite exposure to explosives and incendiary materials. In denying those claims the trial judge said “[t]here is no suggestion that DMSO (or a mixture of DMSO and nitric acid) is explosive; while the mixture may be inflammable, there is doubt that it is ‘incendiary’.” Absence of a basis for resolving any doubt on appeal respecting the incendiary nature of the mixture, coupled with the trial judge’s determination that protective devices and safety measures were in any event sufficient to “practically eliminate” the potential for personal injury, serve to compel our rejection of the argument concerning explosives and incendiary materials.
 

 B. Cleaning Solvents
 

 The appellants claiming EDP for exposure to cleaning solvents worked in a designated “clean room”, dipping guidance system components in a solvent or brushing .the components with the solvent.
 

 The trial judge determined that the cleaning solvents presented no reasonable prospect of personal injury, because they are only slightly toxic and have no adverse
 
 *1388
 
 consequences (beyond a degreasing or defatting effect on the skin, an effect alleviated by lotions or creams).
 

 Appellants attempt to reargue the facts, saying: (1) that potential injury is not limited to degreasing or defatting of the skin; (2) that employees suffer from burns, rashes and circulatory reactions; (3) that airborne solvent concentrations have caused headaches, nausea, and respiratory defects; and (4) that skin degreasing or defatting is not “practically eliminated” by hand creams, lotions, and other protective devices.
 

 There is no evidence of injury resulting from inhalation of solvents, nor of airborne solvent concentrations at a level sufficient to produce harmful consequences over a 10 year period. Though certain solvents might cause a rash or irritation of the eyes or skin, safety goggles and rubber gloves were provided and effectively protected employees from such injuries. We find, therefore, no basis in the record for upsetting the trial judge’s findings on the absence of risk warranting EDP for those working with cleaning solvents.
 

 C. Electroplating & Welding
 

 Eight appellants who perform welding, electroplating, and maintenance of electrolyte storage batteries, were found exposed to a variety of chemicals. The trial judge further found, however, that no contact of any of those chemicals or their fumes with the skin of any appellant produced any harmful consequences (beyond some drying or chapping of the hands, alleviated by creams and lotions).
 

 Appellants’ assertions that welders risk headaches, nausea, and eye and nose irritation from inhaling chemical fumes, and that protective devices do not eliminate risk of injury, are overcome by the weight of the evidence that available ventilation was adequate to exhaust the fumes, and that protective devices (e.g., gloves, aprons, face shields, goggles, respirators) were available and protected the skin and clothing. The record, moreover, reflects no evidence of personal injury resulting from welding, electroplating, or working with storage batteries, during the relevant period. The determinations of the trial judge must therefore be upheld.
 

 D. Beryllium Dust
 

 Though beryllium is not itself toxic, it is undisputed that beryllium dust produced in a machining process is very toxic.
 

 Appellants claiming EDP for exposure to beryllium dust are instrument machinists who work in the Beryllium Room (an enclosed machine shop specially designed for machining beryllium parts), and those who maintain the air filtration system which collects and disposes of the beryllium dust.
 

 Appellants dispute the trial judge’s finding that protective devices and safety measures (e.g., protective clothing, dust collection system, and air sampling system, an air conditioning system, and an alarm system) have practically eliminated the risk of injury from exposure to beryllium dust. That finding, however, is fully supported by the evidence.
 

 Harry Donaldson, a recognized expert in industrial hygiene, after observing AGMC’s beryllium operations and conducting various tests, concluded that potential disease or injury from exposure to beryllium dust was practically eliminated. Moreover, in a study conducted in September 1979 by the National Institute of Occupational Safety and Health, no detectable traces of beryllium were found present in the air in the Beryllium Room.
 

 Though there was one accident related to machining operations in the Beryllium Room, there is no evidence of injury resulting therefrom. Nor is there evidence that any appellant was ever exposed to levels of beryllium dust in excess of the permissible standard.
 
 [7]
 
 The trial judge’s finding must therefore be upheld.
 

 
 *1389
 
 E. Inspection
 

 The trial judge characterized the four inspectors’ EDP claims as analogous to those of the instrument mechanics and repairers whose work they inspected, and denied the former on the basis applied to the latter.
 

 The inspectors were provided the same type of protective clothing and protective equipment as were those employees whose work they inspected. They were not required to, and did not, directly use any chemicals in performing their inspection duties. Nor is there evidence of any personal injury resulting from performance of those duties over a 10 year period. Nothing appears in the record, therefore, to warrant upsetting the finding of the trial judge.
 

 AFFIRMED.
 

 [1]
 

 . Pursuant to order of this court dated October 4, 1982, Judge Wood entered a final judgment on October 8, 1982, corresponding to the decision recommended in this case.
 

 [2]
 

 . Jurisdiction is present under 28 U.S.C. § 1491, granting jurisdiction to the predecessor Court of Claims “to render judgment upon any claim ... founded upon ... any regulation of an executive department ... ”. The Court of Claims denied a motion to dismiss the case for lack of jurisdiction, finding no requirement that appellants be barred by union agreements or by a need to exhaust administrative remedies.
 
 *1384
 

 Bendure, et al. v. United States,
 
 213 Ct.Cl. 633, 554 F.2d 427 (1977).
 

 [3]
 

 . That section provides in pertinent part:
 

 The Office of Personnel Management, by regulation, shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide—
 

 (4) For proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards;
 

 [4]
 

 . The trial judge toured the installation at AGMC. He heard the testimony of 45 employees and 8 supervisors, as well as that of experts called by the parties. The trial judge’s pretrial memorandum and order of August 14, 1980, limiting the number of witnesses, was denied interlocutory review on September 12, 1980. Appellants’ demand for a new trial to enable presentation of additional witnesses is, under all the procedural and substantive circumstances, without merit.
 

 [5]
 

 . Paragraphs 2, 3, 4, and 5, Part II, Appendix J, provides:
 

 Differential Category for which payable rate
 

 8% 2.
 
 Explosives and incendiary material
 
 — high
 
 degree hazard.
 
 Working with or in close proximity to explosives and incendiary material which involves potential personal injury such as permanent or temporary, partial or complete loss of sight or hearing, partial or complete loss of any or all extremities; other partial or total disabilities of equal severity; and/or loss of life resulting from work situations wherein protective devices and/or safety measures either' do not exist or have been developed but have not practically eliminated the potential for such personal injury.
 

 4% 3.
 
 Explosives and incendiary material
 
 — low
 
 degree hazard.
 
 Working with or in close proximity to explosives and incendiary material which involves potential injury such as laceration of hands, face, or arms of the employee engaged in the operation and possible adjacent employees; minor irritation of the skin; minor bums and the like; minimal damage to immediate or adjacent work area or equipment being used.
 

 
 *1386
 
 Differential rate Category for which payable
 

 4.
 
 Poisons (toxic chemicals)
 
 — high
 
 degree hazard.
 
 Working with or in close proximity to poisons (toxic chemicals) . . . which involves potential serious personal injury such as permanent or temporary, partial or complete loss of faculties and/or loss of life including exposure of an unusual degree to toxic chemicals, dust, or fumes of equal toxicity generated in work situations by processes required to perform work assignments wherein protective devices and/or safety measures have been developed but have not practically eliminated the potential for such personal injury. . , .
 

 4% 5.
 
 Poisons (toxic chemicals)
 
 — iow
 
 degree hazard.
 
 Working with or in close proximity to poisons (toxic chemicals other than tear gas or similar irritating substances) in situations for which the nature of the work does not require the individual to be in as direct contact with, or exposure to, the more toxic agents as in the case with the work described under high hazard for this class of hazardous agents.
 

 Paragraphs 3 and 5 were amended in 1977 to include the language “and wherein protective devices and/or safety measures have not practically eliminated the potential for such injury”.
 

 [6]
 

 . This and the claim that a 10 year absence of injury may not be considered (discussed p. 1387 infra) are the only questions of law presented. Under the practice prevailing before 1 October 1982, appellant had filed exceptions to most of the trial judge’s fact findings, those exceptions then formed the bulk of what has become a brief on appeal.
 

 [7]
 

 . AGMC adopted the threshold limit values for beryllium concentration established by the American Conference of Government Industrial Hygienists.