Philip R. BENDURE et al.

v.

The UNITED STATES.

No. 204–75.

United States Court of Claims.

April 20, 1977.

James R. Rosa, Washington, D. C., attorney of record for plaintiff. L. M. Pellerzi, Washington, D. C., of counsel.

Vincent M. Garvey, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## ON DEFENDANT'S MOTION TO DISMISS

COWEN, Senior Judge.

This case is before the court on defendant's motion to dismiss the petition, contending that the court lacks jurisdiction over the subject matter of the suit. Defendant maintains that the plaintiffs' claims have been the subject of collective bargaining negotiation, and that as a matter of law and judicial policy the court may not reconsider subjects which have been so negotiated. We disagree with defendant and for the reasons set forth below, deny its motion.

Plaintiffs are 47 wage-grade civil service employees of the Department of the Air Force at the Aerospace Guidance and Metrology Center, Newark Air Force Station, Newark, Ohio. Their employment engages them in a wide variety of tasks, including: "inertial gyro" cleaning and repair, guided missile renovation and maintenance, "micro-soldering component" inspection, "inertial guidance systems" cleaning, electroplating, and boiler and "dravo heater" cleaning.

Plaintiffs allege in their petition that their work requires them to be subject to a number of health hazards which either have not been or cannot be eliminated or substantially reduced. These hazards include dealing with toxic chemicals and acids, using flammable substances and explosives, breathing in toxic gases and fumes, and cleaning up with harmful solvents. Plaintiffs seek to obtain compensation for these

allegedly undue risks through hazard pay of between 4 and 8 percent of their salaries.

The specific form of hazard pay sought by plaintiffs is known as Environmental Differential Pay (EDP). It is established in appendix J to the Civil Service Commission's Federal Personnel Manual 532–1 (hereafter FPM 532–1), which lists the categories of work for which EDP may be sought, the job situations within each category, and the percentage differential applicable to each category. Plaintiffs contend that their job duties, while not mentioned in appendix J, should be covered by various categories listed in the appendix. The categories for which plaintiffs seek EDP allowances are: "micro-soldering" (Part I, category 8); use of poisons (Part II, category 4); "dirty work" (Part I, category 4); and handling of explosives (Part II, category 2). They claim that they have been entitled to EDP under these categories from as far back as November 1, 1970.

The statutory basis of plaintiffs' claim appears in 5 U.S.C. § 5343(c), (Supp. V 1975) which provides, in pertinent part:

The Civil Service Commission, by regulation, *shall prescribe* practices and procedures for * * * developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations *shall provide—*

* * * * * *

(4) for proper differentials, as determined by the Commission, for duty involving unusually severe working conditions or unusually severe hazards; * * [Emphasis added.]

In executing its statutory duty to prescribe regulations, the Civil Service Commission established a system of environmental pay in the Personnel Manual. Paragraph S8–7(f) of FPM 532–1 provides:

(1) An agency *shall pay* the environmental differential in appendix J to a wage employee paid under a Federal Wage System wage schedule when the employee is performing assigned duties which expose him to an unusually severe hazard, physical hardship, or working condition listed in appendix J, on or after the

effective date specified. [Emphasis added.]

The Personnel Manual further enumerates the circumstances and situations in which EDP "shall be paid." However, the regulations provide no specific machinery for processing or settling disputes between an agency and its employees as to whether or not a particular employment situation qualifies under the broad categories of the appendix.

Although no dispute-settling machinery is provided, the regulations do make allusion to two possible methods of resolving EDP disputes. The first of these is the normal agency grievance procedure, the administrative machinery for handling most local controversies.

Mention of the agency grievance procedure as a method of handling EDP disputes first appears in the Air Force Department's personnel manual (hereafter AF Supplement), which it issued to supplement the Civil Service Commission manual. In a question-and-answer section of the AF Supplement, apparently prepared for the agencies by the Civil Service Commission "in response to a number of agency requests," the following statement appears:

(5) *Question.* How are EDP complaints processed?

*Answer.* Complaints relative to environmental differential pay are processed in accordance with the grievance procedures in AFR 40–771. [AF Supplement, para. S8–7(n)(5).]

Air Force Regulation 40–512, mentioned in the AF Supplement, applies by its own terms "to an appeal concerning the applicability of the environmental and hazard pay differential plans; except for those provisions specifically applicable to the classification of an employee's position." The procedure established by the regulation requires that a complaint be filed before the pertinent Central Civilian Personnel Office, (CCPO) which then:

(1) Investigates the circumstances which are the basis for the appeal, and grants the appeal if it is justified.

(2) If a decision favorable to the employee cannot be made, the CCPO prepares an appeal file and transmits it within 30 calendar days to the appellate level having jurisdiction for decision. [AFR 40–512, para. 17(a).]

Appeal from the CCPO's decision is to the Air Force Major Command in Washington, and Command's decision is final.

Plaintiffs did not follow this customary grievance procedure, as provided in the regulation. However, they did make application to the Civil Service Commission for direct relief on their individual claims. In a letter dated May 10, 1972, the Commission's legal staff replied that:

* * * an employee is entitled to appeal to the Commission the grade, title or series assigned his job, but not the standards established for the job, nor other matters such as his rate of pay, or the propriety of a wage schedule. The system makes no provisions for an employee to appeal to the Commission with respect to any other action by an employing agency.

\* \* \* \* \* \*

In short, *there is no right of appeal to the Commission with regard to agency decisions concerning the applicability of environmental or hazard pay plans except when it affects the grade of a position.* [Emphasis added.]

Plaintiffs apparently felt, upon receiving this letter from the Civil Service Commission, that they had exhausted their administrative remedies.

The second possible avenue which the regulations mention as being available to process claims such as plaintiffs advance here, is the collective bargaining process. The principal allusion to the collective bargaining process is found in the FPM Supplement 532–1, para. S8–7g(3), which reads in part:

*Nothing in this section shall preclude negotiations through the collective bargaining process* for determining the coverage of additional local situations under appropriate categories in appendix J or for determining additional categories not included in appendix J for which environmental differential is considered to warrant referral to the Commission for prior approval * * *. [Emphasis added.]

Plaintiffs are all members of Local 2221 of the American Federation of Government Employees (AFGE), which has been their exclusive labor representative since June 10, 1969. In 1971 the union began negotiation for an employment contract which would make provision for environmental differential pay. However, labor and management were unable to agree upon the "standards * * * which were to serve as the basis for determining if particular work situations met the requirements of Appendix J * * *." The Federal Mediation and Conciliation Service was unable to mediate the dispute, and the parties reached an impasse in November 1971.

At first, the union evinced an intention to take the matter to the Federal Service Impasses Panel, as provided by Executive Order 11491 (hereafter E.O. 11491). However, the AFGE local apparently changed its mind, and the parties signed a contract in 1972 which made no mention of EDP coverage. Although the union raised the matter again in 1975 when it negotiated a new contract, it did not succeed in obtaining an EDP coverage provision. The union made no attempt to submit the matter to an Impasses Panel on the 1975 contract.

While no EDP has been provided for the positions held by plaintiffs, there is some EDP coverage available to other Newark employees. This coverage arose as a result of an examination by medical and safety officers, classification and standards personnel, and a Bio-Environmental team from the Air Force Medical Center at Wright-Patterson Air Force Base. Upon completion of the study, the installation Commander, C. M. Burkhard, recommended to the CSC on November 12, 1970, that one "local situation" be covered by EDP, and that no new categories needed to be established in addition to those covered by appendix J.

The attempt to resolve the issue regarding EDP for plaintiffs through the collec-

tive bargaining process has not been successful, and plaintiffs' resort to the agency grievance procedure was abortive. They did not follow the formal grievance mechanism.

## I.

As its principal ground for dismissal of plaintiffs' petition, defendant contends that the failure of plaintiffs' union to have the EDP dispute resolved by the Federal Service Impasses Panel, as provided by Executive Order 11491, deprives this court of jurisdiction. This argument is based on a defense frequently asserted by the Government, namely, that the failure of a claimant to exhaust an available administrative remedy requires the court to dismiss his petition.

Before we discuss defendant's main contention, we first consider whether plaintiffs have a right to sue in this court because they did not utilize the remedy provided by the agency grievance procedure.

The inquiry must begin by noting at the outset that EDP is a specific, statutory right granted by Congress to Government employees; it grants them extra pay in those situations where the tasks of their work subject them to inescapable environmental risk. 5 U.S.C. § 5343(c). However, neither Congress in granting the right, nor the Civil Service Commission in promulgating regulations to "provide" for that right, has provided a mechanism to resolve disputes concerning the applicability of EDP to particular situations. As a result, there presently exists no means for employees to secure their rights when the agency disagrees with them, and the lack of such an adequate procedure means there is less restraint on agency denial of applications for EDP.

■ The judicial doctrine that requires a plaintiff to exhaust administrative remedies before resorting to the courts is not absolute. In the discretion of the court, it may be waived when such unusual circumstances exist as to make application of the doctrine unjust. *Shubinsky v. United States,* 203 Ct.Cl. 199, 203, 488 F.2d 1003, 1006 (1973);

*Piccone v. United States,* 186 Ct.Cl. 752, 759, 407 F.2d 866, 869 (1969).

■ Courts will, as a general rule, refuse to require administrative exhaustion when resort to the administrative remedy would be futile, including situations where plaintiffs would be "required to go through obviously useless motions in order to preserve their rights." *Walsh v. United States,* 151 Ct.Cl. 507, 511 (1960), *cert. denied sub nom. Alexander v. United States,* 365 U.S. 880, 81 S.Ct. 1029, 6 L.Ed.2d 191 (1961); *see also Lodge 1858, Am. Fed. Govt. Employees v. Paine,* 141 U.S.App.D.C. 152, 436 F.2d 882, 896 (1970).

There are several circumstances in this controversy which indicate that any resort by plaintiffs to the agency grievance procedure would have been futile. Foremost among these is that as a result of the Commission's interpretation of its jurisdiction, the grievance procedure could not have been completed in the manner required to provide an adequate administrative remedy. The grievance procedure, by its own terms, depends upon the right of appeal from a hearing examiner's report to the full Civil Service Commission. In the absence of such appeal rights, the grievance procedure is inadequate, amounting to little more than an internal shifting of decision making within the employing agency. With respect to the claims before us, the Civil Service Commission notified plaintiffs in no uncertain terms that there was "no right of appeal to the Commission with regard to agency decisions concerning the applicability of environmental or hazard pay plans * * *." In other words, if the agency persisted in its contention that no EDP was allowable, there was no other forum where plaintiffs could seek redress.

A similar situation was before the court in *Booth v. United States,* 193 Ct.Cl. 790, 436 F.2d 474 (1971). There, plaintiffs' agency had recommended to the Commission that plaintiffs be authorized hazardous duty pay, but the request was denied and there was no provision for the employees to appeal from the denial on their own accord.

The Commission offered, after the case was submitted to the court, to grant a special hearing to plaintiffs, but under the circumstances, we held that such a permissive remedy was insufficient and that "there was no other administrative remedy available to these plaintiffs." *Id.,* at 794, 436 F.2d at 476. The same considerations that led us to this conclusion in *Booth* persuades us that the administrative remedy was inadequate in this case.

Even if plaintiffs had tried to use the grievance procedure, it is unlikely that the agency would have ruled on the matter. The Air Force's regulation AFR 40–771, section A, paragraph 7d. provides that the agency will not make any "decision" upon any grievance questions which concern "matters that management is obligated to discuss with an exclusively recognized labor organization * * *." It has been the position of the Air Force from the early stages of this controversy that the issues raised by plaintiffs were to be dealt with in labor negotiation, and therefore that the "existing instructions on environmental differentials do not provide for an appeals procedure" under the grievance system.

■ In short, had plaintiffs attempted to pursue the administrative grievance procedure (1) it is highly probable that they would not have been able to obtain a decision on the matter, because the agency felt the subject to be cognizable only within the collective bargaining process; and (2) even if plaintiffs had been able to obtain an agency decision, they would have had no appeal right to the Civil Service Commission. Under the circumstances, we hold that plaintiffs were not required to resort to the grievance procedure before bringing this action.

## II.

■ The defendant advances two arguments in reliance on the collective bargaining procedure provided by Executive Order 11491, as amended.[1] As previously indicated, plaintiffs' union, AFGE Local 2221, unsuccessfully attempted to negotiate an agreement with officials of the Newark Air Force Station which would provide EDP for plaintiffs and other employees similarly situated. Defendant argues vigorously that when the matter reached an impasse, plaintiffs' exclusive remedy was an appeal by the union to the Federal Service Impasses Panel and that the failure of the union to resort to the Panel is a course of action which binds plaintiffs and conclusively bars their right to maintain this action. We think that the provisions of section 17 of the Executive Order and also paragraph S8–7g(3) of FPM 532–1, the Commission's implementing regulation, demonstrate quite clearly that the use of the collective bargaining process and the right to appeal to the Panel is at the most an alternative, permissive remedy which in no way deprives this court of jurisdiction.

Paragraph S8–7g(3) of the regulation begins with the statement: *"Nothing in this section shall preclude negotiations through the collective bargaining process * * *."* [Emphasis added.]

Section 17 of the Executive Order, entitled "Negotiation impasses," reads as follows:

When voluntary arrangements, including the services of the Federal Mediation and Conciliation Service or other third-party mediation, fail to resolve a negotiation impasse, either party *may* request the Federal Service Impasses Panel to consider the matter. The Panel, in its discretion and under the regulations it prescribes, *may* consider the matter and *may* recommend procedures to the parties for the resolution of the impasse or may settle the impasse by appropriate action. Arbitration or third-party fact finding with recommendations to assist in the resolution of an impasse *may* be used by the parties only when authorized or directed by the Panel. [Emphasis added.]

It is abundantly clear from the matter quoted that the right to utilize the collec-

1. 34 Fed.Reg. 17605 (1969), amended by E.O. 11616, 36 Fed.Reg. 17319 (1971); E.O. 11838, 40 Fed.Reg. 5743 (1975); and E.O. 11901, 41 Fed.Reg. 4807 (1976).

tive bargaining procedure is only an optional right or remedy which is not precluded but certainly is not mandatory. Also, section 17 plainly states that resort to and action by the Impasses Panel is wholly discretionary. If there were any doubt that the collective bargaining procedure is merely a permissive avenue of relief, we think the doubt was erased by a recent decision of the Assistant Secretary of Labor for Management Relations, acting pursuant to his responsibilities under Executive Order 11491. *In re Am. Fed. Govt. Emp. AFL–CIO, Local 902,* No. 20–4753 (CA) (1975). Plaintiff's Attachment B.

In interpreting section 17 of the Executive Order, the decision read in pertinent part as follows:

> * * * In my view, Section 17 of the Order must be read literally when it states that "either party *may* request [emphasis added] the services of the Panel when an impasse in negotiations has been reached. Nothing in the Order or its "legislative history" supports the conclusion that the services of the Panel must be requested to consider an impasse under the circumstances outlined by the Administrative Law Judge. In the absence of specific countervailing evidence, I can only conclude that the framers of the Order intended to give the parties discretion with respect to seeking the Panel's services.
>
> * * * * * *

We emphasize, as do plaintiffs, that this is an interpretation which was "rendered by the President's appointed agent for the administration of Executive Order 11491."

Defendant's alternative position is that if the court concludes that an appeal to the Federal Service Impasses Panel is not an exclusive remedy, it is at a minimum a mandatory administrative remedy which must be exhausted prior to suit. Surprisingly, defendant couples this assertion with the contention that Executive Order 11491 provides no right to judicial review.[2] We find that these contentions are conflicting and in any event conclude that the doctrine

of exhaustion of administrative remedies has no application in this case.

In discussing the doctrine of exhaustion of administrative remedies, the Supreme Court has declared that it is a rule which is "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. * * *" *United States v. Western Pac. R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Implicit in the doctrine of exhaustion is the assumption that a court has jurisdiction to review the decision of the agency having the power to grant relief in the first instance and to render judgment for the claimant if the decision is found to be fraudulent, arbitrary, capricious, or contrary to law. Therefore, where the courts have no jurisdiction to review the administrative decision, the doctrine does not apply except in cases where the agency has exclusive jurisdiction. In this case, as defendant has acknowledged, all of the courts which have considered the question have held that Executive Order 11491 was not issued "under statutory authority providing for presidential implementation or effectuation of statutory provisions" and therefore that it confers no jurisdiction on the courts under the Tucker Act to review the agency action. *Local 1498, Am. Fed. of G. Emp. v. American Fed. of G. Emp.,* 522 F.2d 486, 491 (3d Cir. 1975). The United States Court of Appeals for the District of Columbia Circuit has described the status of the Executive Order as follows:

> Executive Order 10988 represents in essence a formulation of broad policy by the President for the guidance of federal employing agencies. It had no specific foundation in Congressional action, nor was it required to effectuate any statute. It could have been withdrawn at any time for any or no reason. * * *
>
> * * * * * *

2. Defendant's moving brief at p. 18, n. 42.

The President did not undertake to create any role for the judiciary in the implementation of this policy. * * * [*Manhattan-Bronx Postal Union v. Gronouski,* 121 U.S.App.D.C. 321, 350 F.2d 451, 456 (1965).]

■ Since the collective bargaining procedure authorized by the Executive Order provides only an optional remedy through recourse to the Impasses Panel which may but is not required to grant relief, it follows that the doctrine of exhaustion is inapplicable; if the Panel refuses to consider the appeal or if it declines to grant any relief, there is no right to judicial review. *Medbury v. United States,* 173 U.S. 492, 497, 19 S.Ct. 503, 43 L.Ed. 779 (1899). Thus it is that the alleged administrative remedy upon which the defendant rests its motion falls in the same category as a permissive administrative remedy which this court dealt with in *Booth v. United States, supra.* Consequently, plaintiffs have the right to sue under our basic jurisdictional grant, the Tucker Act.

■ It is also well settled that the exhaustion doctrine may not be interposed to stay the exercise of a court's jurisdiction when the administrative remedy is inadequate. *United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). In an effort to overcome this obstacle, the defendant makes several tenuous arguments. First, defendant says plaintiffs can encourage their union representatives to put forth a proposal for EDP when the contract comes up for renegotiation, and if the proposal is not adopted, they can urge the union to take the issue to the Impasses Panel. Since plaintiffs have already traveled this unsuccessful route for several years, we cast aside this contention as the kind of obviously useless motion which we rejected in *Walsh v. United States, supra.* Secondly, defendant suggests that plaintiffs may *possibly* file suit against their union for breach of its duty of fair representation. We first observe that since an appeal by the union to the Panel is, by the express terms of Executive Order 11491, left completely in the discretion of the union, plaintiffs' chances of prevailing in such a suit would be extremely remote. More to the point, we know of no authority—and defendant cites none—which requires a litigant to abandon his suit in a court which has jurisdiction of his cause of action, and to sue in another to require resort to any administrative agency which has complete discretion to decline jurisdiction.

■ Defendant's final argument is that even if we hold that we have jurisdiction, the court should, in its discretion, decline to exercise that jurisdiction for to do so would interject the court into the collective bargaining process.

As previously indicated, plaintiffs' union and officials of the Newark Air Force Station have entered into several collective bargaining agreements, including the 1975 contract which is still in effect. Doubtless during these negotiations each of the parties asked for concessions which were ultimately abandoned and omitted from the contract. Either of the parties dissatisfied with the results of the negotiation had the right to appeal to the Panel for assistance in resolving impasses, but neither chose to do so. To us, the failure of the union to seek the intervention of the Panel is an indication that Local 2221 considered that it was in the best interests of all members of the union to sign the 1975 contract and drop the request for EDP coverage. Under these circumstances, we are not persuaded that the exercise of the court's jurisdiction would involve an unwarranted intrusion into the collective bargaining process. Even if we were so persuaded, however, there is a fundamental and overriding principle which constrains us to deny defendant's motion. In sharp contrast to the optional and permissive provisions of Executive Order 11491 are the mandatory provisions of the applicable statute. Title 5, U.S.C. § 5343(c) 3 (Supp. V 1975) states:

* * * The [Civil Service Commission] regulations *shall* provide—

* * * * * *

(4) for proper differentials, as determined by the Commission, for duty involving * * * unusually severe hazards; * * *. [Emphasis added.]

Similarly, 5 U.S.C. § 5545(d) requires that:

The Commission *shall establish* a schedule or schedules of pay differentials for * * * duty involving unusual physical * * * hazard. * * * [Emphasis added.]

There is of course a factual issue as to whether plaintiffs perform duties which expose them to hazardous working conditions as defined in the regulations. (Appendix J to FPM Supplement 532–1, subchapter S8.) However, if plaintiffs can establish in a court trial that their duties involve such working conditions, the statute requires that they receive the extra pay. Despite the salutary objectives which led the President to promulgate Executive Order 11491, it is our opinion that this statutory right may not be abrogated or denied to plaintiffs because of the failure of plaintiff's union to obtain a collective bargaining agreement which permitted EDP for plaintiffs. In reaching this conclusion, we rely on *Tennessee Coal & RR. v. Muscoda Local 123, UMW,* 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949 (1944) and *Jewel Ridge Coal Corp. v. Local 6167, UMW,* 325 U.S. 161, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945). In the first of these decisions, the Supreme Court held that the right of miners to be compensated for underground travel time was required by the Fair Labor Standards Act and that a collective bargaining agreement to the contrary could not be utilized to deprive the employees of their statutory rights. We think the rights afforded plaintiffs under the EDP provisions of Title 5 U.S.C. are of the same nature as those dealt with by the Supreme Court in the cited cases, and that these rights may not be extinguished by a collective bargaining agreement.

### III.

It follows from the foregoing that defendant's motion is denied. The case is hereby returned to the Trial Division for trial or other disposition on the merits.