**OMNI MOVING & STORAGE OF VIRGINIA, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 143–89C.**

United States Claims Court.

Aug. 6, 1990.

Alan F. Wohlstetter, Washington, D.C., attorney of record for plaintiff.

Catherine A. Christman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This transportation rate case is before the court pursuant to defendant's RUSCC 12(b)(1) motion to dismiss for lack of subject matter jurisdiction and, alternatively, for failure to state a claim upon which relief may be granted under RUSCC 12(b)(4). Plaintiff, Omni Moving & Storage of Virginia, Inc. (Omni), a regulated freight forwarder, seeks to recover $4,619.64 in contract damages for shipping rate adjustments purportedly due from the United States, acting through the Military Traffic Management Command (MTMC or defendant). Jurisdiction is premised on the Tucker Act, 28 U.S.C. § 1491(a)(1).[1]

---

1. 28 U.S.C. § 1491(a)(1) (1988) provides in part: The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States....

The defendant moves for dismissal on the grounds that this court lacks jurisdiction over the claim because Omni did not file an adjustment request with MTMC, which was allegedly required by the MTMC–Omni contract, and thus failed to exhaust its mandatory administrative remedies under that contract. In substance, the same grounds are asserted as the basis for its motion to dismiss for failure to state a claim. Omni, however, contends that it was not required to file individual adjustment requests under the contract when such a request had already been filed by a similarly situated freight forwarder. It argues further that, even if such individual filings were mandatory under the contract, pursuit of such administrative remedies would have been futile and useless because a similarly situated forwarder had previously filed identical requests, which were denied by MTMC. For the reasons stated below, both motions presented by the defendant are DENIED.

*Facts*

Omni is a freight forwarder of used household goods (HHG) and unaccompanied baggage (UB). It participates in a Department of Defense (DOD) program in which private freight forwarders compete for the right to ship the personal property of military service members, their dependents, and civilian DOD employees under Government Bills of Lading (GBL) to and from points in the continental United States (CONUS) and points overseas. This enterprise is known as the International Through Government Bill of Lading (ITGBL) Personal Property Program. MTMC is responsible for directing, controlling, and supervising all of those functions incident to the acquisition of transportation for DOD freight. Thus, MTMC is charged with the authority to administer the ITGBL program. Shipments under the ITGBL program flow in both domestic and international commerce, but the responsibility for the solicitation of transportation rates, and the establishment of contract terms and conditions, is centralized in MTMC.

Under the ITGBL program, shipments of household goods and unaccompanied baggage are tendered to the freight forwarder for movement from origin to destination under the forwarder's responsibility as a common carrier. The forwarder packs the goods in specially-designed containers and arranges for movement by marine or air carriers to transport those shipments. The selection of carriers and the route of shipment is generally left to the forwarder. The forwarder is thus viewed as a shipper in its relationship with the carriers selected and, as such, the forwarder purchases transportation services from, and pays the transportation rates charged by, those carriers.

To compete under the ITGBL program, freight forwarders such as Omni are required to file shipping rates with MTMC every six months in order to become eligible for a contract award for these international shipments of personal property. These rates are known as "single factor" rates. The single factor rate includes all charges associated with pick-up, parking, line haul, port services, over ocean transportation, residence delivery, and unpacking. It covers the total cost of shipping and is therefore intended to reflect, in one single dollar figure, both the expense and the profit of the freight forwarder. MTMC solicits these single factor rates twice a year, by means of a solicitation letter, for six-month performance periods known as "volumes."

This case involves the performance of these shipping services over a six-month period styled "Volume 46," which initially ran from April 1, 1983 to September 30, 1983. The length of Volume 46 was later extended to October 31, 1983. The solicitation letter for Volume 46 was issued on September 29, 1982. This solicitation provided, among other things, that October 29, 1982 would serve as the date on which the single factor rate cost data would be established. This date is known as the "pegged quotation date" (PQD), the day on which all participants in the ITGBL program were required to construct their single factor rates on the basis of costs in effect at that time.

The Volume 46 solicitation also included by reference the "Standing ITGBL Rate Filing Instructions and Procedures" (Standing Instructions), which were formulated when MTMC established the Single Factor Rate Adjustment (SFRA) program in 1972. MTMC developed the SFRA program to reimburse forwarders for legally-applicable transportation rate increases that first become public knowledge after the established PQD for each volume. Freight forwarders were thus provided with a procedure whereby they could bid for contracts under the ITGBL program on the basis of rates in effect on the PQD, and then file for a rate increase if the rates did in fact increase at the time of actual shipment. The SFRA program was intended to protect ITGBL program participants from subsequent rate increases that would diminish the expectations on contracts awarded to low ITGBL program bidders. It served as a similar benefit to MTMC, insofar as the SFRA program encouraged forwarders to calculate their single factor rates based on applicable rates providing the most economical, efficient, and viable service best suited to the operations of each individual carrier.

The provisions of the SFRA program were incorporated into the Standing Instructions. The defendant and Omni agree that the paragraphs germane to this dispute are found in Chapter I "Definitions," paragraph 2002 "Authorized Adjustments to the Single–Factor Rate (SFR)," and paragraph 2012 "Military Basic Tender," Chapter III "System Rate Filing Procedures," paragraph 3006 "Authorized Adjustments to the SFR—Classes 1, 2, and 3," and particularly Chapter VI "Purchased Transportation Adjustment Procedures," paragraph 6001 "Requests for Rate Adjustments Due to Changes in Purchased Marine or Air Transportation Costs."

These provisions provide as follows:
2002. *Authorized Adjustments to the Single–Factor Rate [defined]. MTMC may authorize adjustments to the SFR for changes in the cost of underlying purchased transportation,* for fuel surcharges and for currency fluctuations. MTMC reserves the right to determine the nature, timing, and amount of these adjustments. *After a particular adjustment is authorized, the specific details concerning that adjustment will be communicated to the appropriate industry rate bureaus/associations for inclusion in the Military Basic Tender (MBT).*

\* \* \* \* \* \*

2012. *Military Basic Tender [defined]. A tender issued by a rate publishing association, bureau, or conference or individual carrier which contains uniform provisions, rules, and/or regulations governing the application of the SFR's ... and MTMC authorized adjustments to the SFR.* These tenders cover DOD personal property shipments moving between CONUS and overseas rate areas....

\* \* \* \* \* \*

3006. *Authorized Adjustments to the SFR—Classes, 1, 2, and 3 [system rate filing procedures].* To minimize uncertainty in preparing rate submissions, *when authorized, adjustments to the SFR for cost changes in purchased underlying transportation,* currency fluctuation, and fuel surcharges *will be automatically passed through to all carriers and will not affect a carrier's relative competitive standing.* Authorized adjustments, to the SFR, will be processed in accordance with Chapter VI [purchased transportation adjustment procedures].

\* \* \* \* \* \*

6001. *Requests for Rate Adjustments Due to Changes in Purchased Marine or Air Transportation Costs [purchased transportation adjustment procedures].*

a. *As a minimum, requests for rate adjustments under the procedures herein must provide the following elements of information:*

(1) *The requested adjustment must represent a change in purchased marine or air transportation costs of not less than 2.5%.*

(2) Requests for adjustment must be based on underlying rate increases that became public knowledge after the pegged quotation date.

(3) No viable underlying service at the former rate level remains. Viable service is defined as....

(4) A narrative explanation of the proposed rate adjustment (such as: applicable volume (a), Code (2) of Service) and the circumstances that resulted in the adjustment and the proposed effective and expiration dates.

(5) A proposed MBT and/or manual rate tender item exactly as it should appear in the tenders.

(6) Computations supporting the proposed adjustment to include "old" and "new" underlying transportation rates, conversion factors to express adjusted underlying carrier rates in terms of SFR's on file with MTMC, proposed new rates in dollars and cents per net or gross hundredweight, etc.

(7) Copies of all "expired" and "effective" tariff pages of viable carriers showing any increase or decreases that acurred [sic] since the pegged quotation date to include increase supplements, tariff cancellations and/or tariff adoptions, or any similar tariff changes that would affect the rate. All rates to be considered for adjustments must be highlighted.

(8) A listing of all U.S. Flag carriers participating in the trade route applicable to the requested adjustment.

(9) *The request for adjustment must be received by MTMC, Rate Acquisition Division, not later than 60 calendar days following the expiration date of the applicable volume SFR.*

b. MTMC will favorably consider requests for rate adjustments that meet the above criteria and satisfy additional administrative requirements contained herein. *Requests must be submitted by individual ITGBL carriers or associations/bureaus that are the publishing agents for the international MBT's.* The effective date of approved adjustments will be the effective date that viable alternative underlying service is no longer available. Once approved a carrier must rebill to receive compensation for these adjustments. Rebilling must include all applicable adjustments regardless of whether they result in increases or decreases to the carrier.

c. *Following consideration and approval of rate adjustments by MTMC, adjustments will be authorized by a new item in the applicable MBT's or by supplement to manual rate tenders, as appropriate. MTMC will submit adjustment items to the bureaus and associations for inclusion in the MBT's.* Supplements to manual rate tenders will be based on MTMC-approved input and the applicable instructions relative to filing manual rate tenders. MTMC will distribute accepted MBT's and manual rate tender supplements to ITO's [Installation Transportation Offices][2] and other Federal agencies.

(emphasis added).

Omni participated in the solicitation for Volume 46 according to the guidelines of the Standing Instructions and the terms set out in the MTMC solicitation letter of September 29, 1982. Prior to the submission of its bid, Omni was advised by its port agent, Movers Port Service (MPS), that the lowest ocean transportation rates for Code 4 household goods available on the PQD were rates known as Freight All Kinds (FAK).[3] Omni thus calculated its Volume 46 single factor rate bids for the shipment of Code 4 household goods on these FAK rates. Omni received several shipping contracts for the transportation of household goods from CONUS to various European destinations. However, sometime subsequent to the PQD for the Volume 46 shipping period, the ocean carriers that Omni

---

2. Individual GBL shipments are arranged by the ITO, which has a multitude of worldwide locations. Nevertheless, the terms and conditions employed in those transactions are determined by MTMC.

3. The shipments involved here concern transportation rates from CONUS to points in Germany, Belgium, the Netherlands, England, and Scotland.

intended to employ restricted the subject FAK rates to prohibit the shipment of Code 4 household goods. This forced Omni to incur higher shipping costs than anticipated, insofar as it was forced to ship the subject Code 4 household goods at more expensive rates.

Omni considered filing a request for a single factor rate adjustment pursuant to the Standing Instructions, based on the increased costs resulting from the restriction of FAK ocean tariffs against the shipment of Code 4 household goods. However, it was aware that another participant in the ITGBL program, Four Winds Forwarding, Inc. (Four Winds), had already prepared and filed requests for single factor ocean rate adjustments on a basis that would purportedly have been identical to those rate adjustment requests contemplated by Omni. It determined that the requests would have been identical because both had the same port agent, both had been advised by that port agent that the lowest rates available on the PQD were FAK rates, both had submitted their bids on the basis of those rates, both shipped in many of the same channels from port of origin to port of destination, both shared, on a *pro rata* basis, costs incurred from consolidated shipping on a common carrier, and both incurred increased costs when the FAK rates were restricted against the shipment of Code 4 household goods.

Thus, Omni concluded that the factual basis for its requests would duplicate those of Four Winds. Furthermore, Omni was under the belief that, pursuant to the Standing Instructions, paragraph 6001c, *see supra*, any favorable single factor rate adjustment rendered by MTMC on the requests filed by Four Winds would be published in the Military Basic Tender (MBT). Under its interpretation of the Standing Instructions, Omni further believed that once a single factor rate adjustment was published in the MBT, that rate adjustment would be available to all ITGBL program participants who shipped in the same channels. Thus, it thought that if Four Winds obtained single factor rate adjustments for Code 4 household goods from MTMC, Omni would be similarly entitled to obtain com-

pensation under the new single factor rate adjustments published in the MBT. On this basis, Omni determined that rate adjustment requests of its own would be duplicative and unnecessary.

Four Winds filed its requests for Volume 46 single factor rate adjustments on December 27, 1983. Omni, for the reasons set forth above, decided not to file such a request. Thus, the deadline for filing Volume 46 single factor rate adjustment requests, December 31, 1983, passed with MTMC having received a filing only from Four Winds. MTMC later denied all of Four Winds' requests because, in its view, an adjustment could not be based on FAK rates. Four Winds, however, pursued a judicial determination of its claim. Thus, in *Four Winds Forwarding, Inc. v. United States*, 13 Cl.Ct. 510 (1987), the MTMC decision to deny the Four Winds' adjustment requests was overturned. In short, the court held that Four Winds was entitled to an adjustment under the SFRA program based on the cost differences between the FAK rates bid and the transportation rates actually paid at the time of shipment. *Four Winds*, 13 Cl.Ct. at 518. Relying on this decision, Omni seeks $4,619.64 in rate increases for the difference in the shipping costs it bid and the increased shipping costs it incurred.

*Contentions*

The defendant asserts that this court lacks jurisdiction under RUSCC 12(b)(1) on the basis that Omni failed to comply with a mandatory administrative remedy. The crux of its argument lies in the undisputed fact that Omni did not file any single factor rate adjustments *of its own*. It is the defendant's position that, under those portions of the Standing Instructions which compose the relevant part of the MTMC–Omni contract, Omni did not exhaust the mandatory administrative remedies required under that contract. More specifically, it asserts that, under paragraphs 6001a and 6001b of the Standing Instructions, Omni was contractually obligated to file individual single factor rate adjustments with the MTMC alleging, among other things, additional transportation costs of

2.5% or more within 60 days following the conclusion of the Volume 46 shipping period.

Alternatively, the defendant avers that Omni has failed to state a claim upon which relief may be granted under RUSCC 12(b)(4). The defendant alleges that Omni cannot prove those facts necessary to show that it is entitled to the requested relief. In particular, the defendant contends that Omni has failed to show, as it must under the Standing Instructions, both that it suffered an actual 2.5% increase in purchased ocean transportation costs under paragraph 6001a(1), and that it complied with the 60–day time filing limitation imposed by the contract under paragraph 6001a(9).

Omni, however, disputes the applicability of the exhaustion doctrine. It asserts that it was not required to file individual single factor rate adjustment requests of its own where Four Winds had already filed such requests based on the identical circumstances giving rise to rate increases. This is true, in Omni's view, because if MTMC had initially authorized the SFR increases, as requested by Four Winds and eventually approved by the Claims Court, those adjustments would have been published in the MBT, and thus automatically made available to all carriers similarly situated. Consequently, Omni alleges that "under the terms of the Standing Instructions and under MTMC's consistent practice, when an individual carrier filed an adjustment request which was favorably considered by MTMC, an item was issued by MTMC for publication in the MBT and other similarly situated carriers could, and did bill, and were paid under such items."

Moreover, Omni also asserts that, even if it was *required* to exhaust its administrative remedies by filing individual single factor rate adjustment requests of its own, the exhaustion doctrine should not be applied in this case. It alleges that it and Four Winds were similarly situated in all material respects, insofar as both bid single factor rates based on the lower FAK rates which became unavailable after the PQD, and both were subsequently required to ship household goods at higher rates. Omni, therefore, argues that its own adjustment filing would have unnecessarily duplicated that of Four Winds, *i.e.*, a futile and useless act. As further support for its futility argument, Omni points to the MTMC's categorical denial of Four Winds' adjustment requests on the grounds that an increase was not available for single factor bid submissions based on FAK rates. In sum, Omni avers that all the traditional purposes of the exhaustion doctrine were satisfied by the adjustment requests of Four Winds, thereby disposing of any need for additional "futile and useless" filings by Omni.

In response to the defendant's alternative RUSCC 12(b)(4) motion to dismiss for failure to state a claim upon which relief may be granted, Omni points to the complaint to show that its own rate increases were pled properly.[4] As for the filing requirement, Omni again states that it was not required to file requests duplicating those filed by Four Winds.

*Discussion*

Against the foregoing background, the ultimate inquiry in this case is—whether Omni may seek direct access in this court under the Tucker Act, 28 U.S.C. § 1491(a)(1) without having first filed its own adjustment requests under paragraphs 6001a and 6001b of the Standing Instructions. The defendant alleges that Omni was required to file individual SFR adjustment requests with the MTMC within 60 days after the conclusion of Volume 46 shipments, pursuant to paragraphs 6001a(9) and 6001b of the Standing Instructions. Omni alleges, on the other hand, that it was not obligated to make a separate individual filing, since Four Winds previously filed for the same adjustments with MTMC which, if they had been approved, would have subsequently been available to all forwarders shipping in the same channels. If Omni is correct in its contention

---

4. In the complaint, Omni details the single factor rate adjustments filed by Four Winds, and then details facts which allegedly demonstrate that it shipped from the same area ports and to the same area destinations as Four Winds. *See* Complaint, paragraphs 8–10, 14–22.

that it was not required to file its own SFR requests for adjustment, the adjustments ultimately ordered by the Claims Court in *Four Winds* will automatically inure to the benefit of all similarly situated forwarders. Accordingly, the *dispositive* issue in this case is—whether the 60–day filing provision imposed by paragraph 6001a(9) is a mandatory requirement for each and every forwarder seeking SFR adjustments, even where an initial filing has already occurred under *identical circumstances*. We find that the adjustment filing remedy described in the Standing Instructions was permissive, so long as at least one similarly situated forwarder filed SFR adjustment requests for shipping in the same channels prior to the expiration of the 60–day period prescribed in paragraph 6001a(9).

Prior to our analysis of that issue, however, we must first decide whether to proceed under the defendant's primary RUSCC 12(b)(1) motion to dismiss for lack of jurisdiction, or whether it is more appropriate to resolve this matter under the defendant's alternative RUSCC 12(b)(4) motion to dismiss for failure to state a claim upon which relief may be granted. We think that the motion for failure to state a claim is the proper vehicle for the disposition of the issues presented here. This is so because the defendant avers, as a basis for both motions, that the 60–day time bar is fatal to the Omni claim. This assertion is an affirmative defense going to the merits, and "[t]he presence of a valid defense ... does not oust a tribunal of jurisdiction unless, of course, the defense is jurisdictional." *Do–Well Machine Shop, Inc. v. United States*, 870 F.2d 637, 639 (Fed.Cir. 1989).[5]

The defense asserted by the defendant in this case, failure to exhaust administrative remedies, is not, however, properly viewed as a jurisdictional defense. It is clear that the application of the exhaustion doctrine[6] is discretionary in the absence of statutory mandate. *E.g., Cafferello v. United States Civil Service Commission*, 625 F.2d 285, 287 (9th Cir. 1980) (citation omitted). Moreover, the use of the doctrine is subject to limitations, *e.g., Bendure v. United States*, 213 Ct.Cl. 633, 640, 554 F.2d 427, 431 (1977), and it should not be employed blindly when the purposes supporting the concept are inapplicable. *E.g., Athlone Industries v. Consumer Product Safety Commission*, 707 F.2d 1485, 1488 (D.C.Cir.1983) (citations omitted). "[J]urisprudential concerns, such as those embodied in the exhaustion doctrine, do not bear on whether a court *has* jurisdiction but only on whether it should *exercise* that jurisdiction." *Association of National Advertisers, Inc. v. Federal Trade Commission*, 627 F.2d 1151, 1157 (D.C.Cir.1979) (emphasis in original).

Consequently, on these bases, we find that Omni has properly asserted a contract claim within our jurisdiction under 28 U.S.C. § 1491(a)(1).[7] The exhaustion doctrine is not jurisdictional, insofar as it does not deprive us of jurisdiction in the absence of a *mandatory* statutory procedure. In the case at bar, jurisdiction exists under 28 U.S.C. § 1491(a)(1) to the extent that we *may* decide whether to permit direct access to this court, or whether to require Omni to exhaust its remedies to further the administrative process. However, that process contemplates an efficacious administrative remedy, *e.g., Humana of South Carolina v. Califano*, 590 F.2d 1070, 1081 (D.C.Cir. 1978) (citation omitted), and its application

---

**5.** Conversely, a dismissal for lack of jurisdiction is made without prejudice, and thus does not go to the merits. *Do–Well Machine Shop,* 870 F.2d at 639–640.

**6.** Under the exhaustion doctrine, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *E.g., Myers v. Bethlehem Shipbuilding Co.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). It is designed "to allow an administrative agency to

perform functions within its special competence—to make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies." *E.g., Aleknagik Natives, Ltd. v. Andrus,* 648 F.2d 496, 499 (9th Cir.1980) (citations omitted).

**7.** For jurisdictional purposes, we are generally required only to examine the statute upon which jurisdiction is premised. *See generally Do–Well Machine Shop,* 870 F.2d at 640.

is not required when the result would be unjust. *Bendure*, 213 Ct.Cl. at 640, 554 F.2d at 431 (citations omitted). Here Omni would have no administrative remedy to pursue due to the alleged expiration of the paragraph 6001a(9) 60–day time limitation. As such, there would be no point in the application of the judicially developed concept of exhaustion, insofar as MTMC would not be required to make a factual record, would have no opportunity to correct errors, and would take no action to moot a judicial controversy. Consequently, it would be inappropriate to decline jurisdiction and proceed on the theory that this case should be dismissed under the exhaustion doctrine.

Rather, we think the exercise of our jurisdiction is appropriate and proper under 28 U.S.C. § 1491(a)(1), and find that the correct method to resolve the subject dispute is to rule on the defendant's RUSCC 12(b)(4) motion to dismiss for failure to state a claim upon which relief may be granted. By this approach, we reach the merits of the claim presented by Omni, the determination of which will carry *res judicata* effect. *Do–Well Machine Shop*, 870 F.2d at 640. The defendant again alleges that Omni was obligated to file an individual application for SFR adjustments with MTMC according to the terms of the contract contained in the Standing Instructions, which, as we have observed, is an affirmative defense. Omni again disagrees, stating that the filing obligations imposed by the Standing Instructions are satisfied so long as at least one similarly situated carrier files for those SFR adjustments. Thus, the issue is clear—whether each individual carrier desiring SFR adjustments must make its own adjustment re-

quests within the 60–day period without reference to the application of any other similarly situated carrier. In other words, in view of the fact that Four Winds filed SFR adjustment requests, we must decide only whether a similar filing by Omni was *mandatory* or *permissive* under the guidelines of the Standing Instructions.

In view of the undisputed fact that Omni did not file its own SFR adjustment requests prior to filing the complaint in this court, the resolution of the subject dispute is solely a matter of contract interpretation. Contract interpretation is, of course, a matter of law. *E.g. Industrial Indemnity Co. v. United States*, 14 Cl.Ct. 351, 356 (1988) (citations omitted). To properly interpret the relevant contract terms set out in the Standing Instructions, we must " 'follow the established general rules that provisions of a contract must be so construed as to effectuate its spirit and purpose, that it must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions, and that an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.' " *E.g. Julius Goldman's Egg City v. United States*, 697 F.2d 1051, 1057–1058 (Fed.Cir.1983), *quoting State of Arizona v. United States*, 216 Ct.Cl. 221, 235–236, 575 F.2d 855, 863 (1978) (citations omitted).

In this case, the relevant contract provisions, to which we must apply the above-stated principles, are found in the Standing Instructions, paragraphs 2002, 2012, 3006, and 6001, *see supra*.[8] For rea-

---

**8.** Both parties agree that these provisions constitute the contract provisions *germane to this dispute.* Moreover, as the court stated in *Dean Forwarding Co., Inc. v. United States*, 2 Cl.Ct. 559, 563 (1983), "[t]he ITGBL program establishes an ongoing contractual relationship.... MTMC is responsible for the establishment of rates, terms, and conditions for freight transportation services that are to be incorporated in separate independent contracts subsequently awarded by the [worldwide Installation Transportation Offices].... [t]he [single factor] rates filed by forwarders [on the PQD] in compliance

with the solicitation letter and the Standing Instructions, when they are certified by [an ITO], are final for contracts for transportation services to be awarded by [an ITO] during the performance period." That final contracts incorporating the terms and conditions of both the September 29, 1982 solicitation letter and the Standing Instructions were awarded to Omni by various ITOs is evinced by the fact that Omni performed several shipping contracts under several GBLs, all pursuant to the terms and conditions established by those two contract documents.

sons discussed more thoroughly, *infra,* we find that those contract terms governing SFR adjustment requests are vague, nebulous, and ambiguous. This is so because arguably both MTMC and Omni can make a case for their respective interpretation of the Standing Instructions. However, we think that the theory advanced by Omni is the more reasonable of the two. Thus, relying on the doctrine of *contra proferentum,* we are compelled to construe the ambiguous provisions of the contract, as embodied in relevant part by the Standing Instructions, against the drafter, MTMC in this case. *See, e.g., Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed.Cir.1988) ("[u]nder the doctrine of *contra proferentum,* the contract is construed against the drafter if the interpretation advanced by the nondrafter is reasonable."), *citing United States v. Turner Construction Co.,* 819 F.2d 283, 286 (Fed. Cir.1987) ("*[c]ontra proferentum* applies when a contractor's reading of an ambiguous contract provision is reasonable in itself.") (citation omitted).[9] Consequently, we find that it was not mandatory for Omni to file its own SFR adjustment requests within 60 days after the termination of the Volume 46 shipping period, so long as it knew that a comparable request that it would otherwise have submitted was *previously* filed by a similarly situated forwarder such as Four Winds. Therefore, knowing that Four Winds filed SFR adjustment requests prior to the expiration of the 60-day deadline, requests which were substantially similar in all material particulars to those which it would have filed, we find that Omni was not obligated to duplicate this act.

The contract ambiguities justifying the application of the *contra proferentum* doctrine come to light only upon the close examination of the provisions implicated in this case. This is particularly true with respect to the primary contract terms at issue here in paragraphs 6001a, 6001b, and

6001c. Before analyzing those sections, however, we think it is instructive to inspect the other provisions relevant to SFR adjustments. We start with the definitions associated with the rate filing process, as contained in Chapter II of the Standing Instructions, paragraphs 2002 and 2012, *see supra.*

Paragraph 2002 defines "Authorized Adjustments to the Single–Factor Rate" by observing that MTMC may authorize adjustments to the SFR for changes in the cost of purchased transportation. It then states that *"[a]fter a particular adjustment is authorized, the specific details* concerning the adjustment *will be communicated* to the appropriate industry rate bureaus/associations *for inclusion in the Military Basic Tender (MBT)"* (emphasis added). Giving ordinary words their literal meaning, it is plainly evident that, if MTMC authorized any adjustments to the SFR, the substantive details of that adjustment, such as an increase or decrease in rates, would, *in every case,* be included in the MBT.

Having concluded that those SFR adjustments authorized by MTMC are to be included in the MBT in all instances, it is helpful to understand what constitutes the MBT. Thus, we turn to the definition of the MBT, as described in paragraph 2012. It provides in relevant part that the MBT is *"[a] tender* issued by a rate publishing association, bureau or conference or individual carrier *which contains uniform provisions,* rules, and/or regulations *governing the application of the SFR's ...* and *MTMC authorized* adjustments to the SFR" (emphasis added). The defendant construes this language to mean that the ITGBL program allowed the publication of multiple MBTs, some of which would have only individual applicability. From this interpretation, the defendant concludes that a SFR adjustment could be published in an

**9.** The contract provisions at issue in this case do not contain a patent ambiguity, and thus are not excepted from the rule of *contra proferentum. See, e.g., American Bankers Life Assurance Co. of Florida v. United States,* 12 Cl.Ct. 166, 173 (1987) (in contract cases involving patent ambiguities, the plaintiff incurs an obligation to request clarification of any perceived inconsistencies and must attempt to alleviate any ambiguity prior to executing the contract) (citations omitted). Here, we find that Omni did not have any duty to seek clarification.

individual MBT, containing adjustments that would not apply to any forwarder other than that forwarder who filed for the adjustment. The ambiguities of that clause permit such an interpretation in the abstract, but we think that such an interpretation is unreasonable.

Reading paragraph 2012 in conjunction with the rest of the relevant contract provisions, and under the rule of *contra proferentum*, we think that the subject MBT definition describes a tender issued by one of four possible rate publishers, an association, a bureau, a conference, or an individual carrier, containing *uniform* provisions, rules or regulations governing the application of authorized MTMC authorized adjustments to the SFR. The word "uniform" clearly means that those authorized SFR adjustments will apply to all shippers. Thus, any adjustment approved by MTMC *must* be published in the MBT, paragraph 2002, and those adjustments published in the MBT, if applicable to the channel in which the forwarder is operating, will contain uniform provisions available to *all* freight forwarders operating in those channels, paragraph 2012.

Our interpretation is further supported by the next operative contract provision. Paragraph 3006 is entitled "Authorized Adjustments to the SFR—Classes 1, 2, and 3," and governs, in part, the initial "System Rate Filing Procedures." It contemplates, in our view, a system which is designed to promote the submission of the lowest possible SFR bids by providing a mechanism that permits SFR increases that will be "automatically passed" on to all similarly situated program participants in the interests of fairness. Paragraph 3006 states that, in order "[t]o minimize uncertainty in preparing bid submissions, when authorized, adjustments to the SFR for cost changes in purchased underlying transportation ... will be automatically passed through to all carriers and will not affect a

carrier's relative competitive standing. Authorized adjustments, to the SFR, will proceed in accordance with Chapter VI [Purchased Transportation Adjustment Procedures]." Thus, the rate filing system envisions a process whereby cost changes in purchased transportation will be available to all carriers to maintain equilibrium amongst them. In this manner, MTMC was able to promote the submission of the *lowest bids* across the board for its economic benefit, under circumstances where each forwarder knew that subsequent increases granted to one would be automatically available to all upon authorization pursuant to the adjustment procedures. MTMC, by pursuing such a policy, was thus able to obtain the lowest bid rates available, thereby discouraging forwarders from "padding" their bids to cover the uncertainties, such as an increase in purchased ocean transportation costs, inherent in bidding on a six-month contract to be performed in the future.[10]

Keeping in mind the definitions in paragraphs 2002 and 2012, in addition to the system rate filing procedure described in paragraph 3006, we now turn to the crucial provisions of Chapter VI. The terms of that chapter "outline procedures for processing price adjustments to ITGBL SFR's due to significant changes in the cost of purchased underlying marine/air transportation...." Paragraph 6000. Paragraph 6001, which is the primary disputed provision of the contract, governs rate adjustment requests for purchased marine transportation costs.

Paragraph 6001a states that such adjustment requests must include several pieces of information. Under that paragraph, a forwarder must submit: (1) adjustment requests that represent no less than a 2.5% increase in purchased transportation costs; (2) adjustment requests that are based on rate increases that become public knowledge after the PQD; (3) adjustment re-

---

**10.** We observe that MTMC actively encouraged forwarders to use the lowest possible transportation rates in their SFR bid submissions. In a message disseminated to all ITGBL participants in July 1982, MTMC stated that it "anticipates, but does not direct, that carriers will construct their single factor rates based upon the applicable rates which provide the most economical, efficient and viable service best suited to the needs of their own operation." *Four Winds,* 13 Cl.Ct. at 512.

quests that show there is no viable service remaining at the former rate level; (4) a narrative explanation of the proposed adjustments; (5) a proposed MBT exactly as it should appear in the tenders; (6) computations to support the proposed adjustments; (7) copies of expired and effective tariff (rate) pages of viable carriers showing any increases or decreases that occurred after the PQD; (8) a listing of all U.S. Flag carriers participating in the trade route applicable to the requested adjustment; and most importantly for this case, (9) adjustment requests that are received by MTMC not later than 60 calendar days following the expiration date of the applicable SFR shipping volume.

It is undisputed that Omni did not file any adjustment requests containing the foregoing information, and thus the defendant contends that it *individually* failed to comply with the alleged *mandatory* 60–day filing requirement of paragraph 6001a(9). To support this proposition, the defendant relies on one sentence contained in paragraph 6001b: "[r]equests must be submitted by individual ITGBL carriers or associations/bureaus that are publishing agents for the international MBT's." Therefore, on this basis the defendant argues that *each and every* forwarder desiring SFR adjustments must file *its own* requests within 60 days following the conclusion of the relevant volume shipping period.

At first blush, this construction of paragraph 6001b appears reasonable. However, Omni construes this provision in a manner which is equally reasonable, particularly when the language of paragraph 6001b is considered in context with the rest of the Standing Instructions that form the MTMC–Omni contract. Omni agrees that the Standing Instructions required the filing of adjustment requests, but it argues that the language of paragraph 6001b cited above necessitated a filing by *only one entity*—submitted by *either* an individual carrier, an association, or a bureau. It further asserts that the adjustment requests relevant to this case were filed by Four Winds on December 27, 1983, several days *before* the expiration of the 60–day

time limitation on December 31, 1983. Thus, it is Omni's position that the filing by Four Winds satisfied the requirements of paragraphs 6001a and 6001b *for all similarly situated forwarders, including Omni.*

In this context, we initially observe that the language of paragraph 6001b does not explicitly require a filing by *each* individual forwarder. This is a necessity which MTMC could have clearly required by merely adding only *one* word in drafting paragraph 6001b to say that "requests must be submitted by *each* individual ITGBL carrier, or by an association or bureau that is a publishing agent for the international MBT." Since it did not do so, we think it is reasonable to read paragraph 6001b in the manner proposed by Omni. Under these circumstances, we hold that an application of *contra proferentum* is clearly justified in construing the ambiguity against the defendant.

The interpretation advanced by Omni is bolstered by reference to paragraph 6001c. There it states that "[f]ollowing consideration and approval of rate adjustments by MTMC, adjustments will be authorized by a new item in the applicable MBT's ... as appropriate. MTMC will submit adjustment items to the bureaus and associations for inclusion in the MBT's.... MTMC will distribute accepted MBT's ... to ITO's [Installation Transportation Offices] and other Federal Agencies." Omni contends that any approved SFR adjustment would, under this paragraph, be published in the MBT, which, being "uniform," *see* paragraph 2012 *supra,* would thereafter be made available to all forwarders who shipped in the *same* ocean channels. On this thesis, Omni asserts that, by knowing of the filing by Four Winds *prior* to the expiration of the 60–day filing deadline, it would have been entitled to rely on, and bill according to, any adjustments later authorized by MTMC, adjustments which would necessarily have been published in the MBT. In view of the subsequent Claims Court determination that Four Winds was entitled to a rate increase, Omni contends that, under its interpretation of the MBT

publishing procedure described in paragraph 6001c, it is similarly entitled to bill for its rate increases without having filed its own adjustment requests.

The defendant counters by averring that it would not have been required to publish approved Four Winds' adjustment requests in the MBT. It argues that those requests would not have necessarily been available to all other forwarders shipping in those channels. It further disputes Omni's claim to rate increases flowing from the Claims Court ruling in *Four Winds*.

We think that paragraph 6001c is susceptible, upon an initial inspection, to both interpretations. However, in view of the meaning we attach to the language of paragraphs 2002 (authorized adjustments *will* be communicated to the appropriate bureau or association for inclusion in the Military Base Tender), 2012 (the Military Base Tender is a tender which contains *uniform* provisions governing the application of the SFR and authorized MTMC adjustments to the SFR), 3006 (adjustments to the SFR for cost changes in purchased transportation will be *automatically passed through to all carriers* so as to maintain the relative competitive standing of forwarders participating in the ITGBL program), and 6001b (adjustment requests must be submitted within 60 days after the expiration of the shipping period for that volume by *either* individual carrier(s), associations, or bureaus), we think Omni's interpretation is reasonable. Therefore, applying the rule of *contra proferentum*, we find that, if MTMC had properly approved the adjustment requests submitted by Four Winds as required,[11] those requests would have been published in the MBT,[12] and Omni would have then been entitled to bill its increased transportation costs under those changes. As such, on these facts, we hold that Omni was not obligated to file its own individual SFR adjustment requests within the 60-day time limitation. That remedy was permissive and not mandatory, to the extent that Omni was aware that such a filing had been previously made by another forwarder shipping in the *same* channel(s).

■ Having determined that Omni was not required, on these facts, to file its own adjustment requests within the 60-day time period described in paragraph 6001a, and such filing being *permissive* in view of Four Winds' previous filing, we now consider whether there are any other grounds upon which to conclude that Omni has failed to state a claim upon which relief may be granted. Under paragraph 6001a(1), a forwarder desiring a SFR adjustment must demonstrate that it has experienced an increase in Volume 46 purchased transportation costs of at least 2.5%, a showing which the defendant argues must necessarily be specific to an individual forwarder. Accordingly, the defendant asserts that Omni has failed to state a claim upon which relief may be granted because, in its complaint, Omni has purportedly failed to allege that it actually sustained such increases.

It is well established that, in passing on a motion to dismiss for failure to state a cause of action, the allegations of the complaint should be construed in favor of the pleader. *E.g., Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Consequently, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (citations omitted). Under this precedent, we reject the second basis advanced in support of defendant's RUSCC 12(b)(4) motion. We do so because we think that the Omni complaint is plainly beyond the pale of any motion to dismiss for failure to state a claim based on an

---

11. We also observe that paragraph 6001c does not expressly provide that an authorized SFR adjustment may be restricted in application to an individual carrier.

12. The MBTs submitted as examples by Omni, along with the Standing Instructions governing the MBT, tend to show that, when published, the MBTs did not indicate what forwarder filed for the adjustment(s) being authorized. This appears to have been true because of the fact that the MBTs carried essential terms that applied equally to all forwarders shipping in the relevant channel and during the relevant volume.

assertion that it has not incurred actual increases in Volume 46 purchased transportation costs of 2.5% or more.

Moreover, we are constrained to so hold because the complaint does allege that Omni individually incurred actual increases in purchased transportation costs. The complaint avers that Omni, like Four Winds, initially used FAK rates as the basis for its SFR bid submissions on the PQD; was unable to ship under those FAK rates due to their subsequent restriction against the inclusion of household goods; and was forced, along with other ITGBL forwarders operating in the same ocean channels, to ship at higher military household goods rates. If Omni is able to prove that it suffered increased costs in excess of 2.5% at a trial on the merits, it will be entitled to the relief sought in its complaint. This is true because, upon showing that it shipped in the same channels as Four Winds, it follows that Omni experienced the same increased purchased ocean transportation costs incurred by Four Winds. For these increased costs, Omni, like Four Winds, should be compensated if they are proven to be meritorious.

*Conclusion*

Omni was not obligated to file its own SFR adjustment requests under paragraphs 6001a(9) and 6001b of the Standing Instructions, so long as it was *aware* that another similarly situated forwarder filed such requests prior to the expiration of the 60–day time limitation. The provisions of the MTMC–Omni contract are ambiguous, and thus, the doctrine of *contra proferentum* compels such a result. Therefore, both motions to dismiss filed by the defendant, for lack of jurisdiction under RUSCC 12(b)(1) and for failure to state a claim under RUSCC 12(b)(4) are DENIED.

Pursuant to RUSCC Appendix G, the following pretrial schedule is hereby established:

1. Discovery by both parties shall be completed on or before September 7, 1990.

2. The meeting of counsel called for by paragraph 10 of Section V of Appendix G shall be held by September 22, 1990.

3. The memoranda and motion called for by paragraphs 11–17 of Section V of Appendix G shall be filed on or before October 15, 1990.

4. The pretrial conference shall be held on October 22, 1990, at 10:00 a.m., at the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. The exact courtroom location will be posted in the lobby at that time. A trial date will be set at that time.

IT IS SO ORDERED.