**OMNI MOVING & STORAGE OF VIRGINIA, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 143–89C.**

United States Court of Federal Claims.

Feb. 25, 1993.

Order on Motion for Reconsideration June 2, 1993.

See also 21 Cl.Ct. 224.

Alan F. Wohlstetter, Washington, DC, attorney of record for plaintiff.

Judith N. Macaluso, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

Omni Moving & Storage of Virginia, Inc. (Omni) filed its complaint in the U.S. Claims Court[1] on March 17, 1989, claiming breach of contract and seeking monetary damages for ocean rate adjustments. Plaintiff claimed adjustments due under the Department of Defense International Through Government Bill of Lading program. At bar, the claim is based on adjustments made under the DOD Single–Factor Rate Adjustment (SFRA) program to an associated shipper. *See Four Winds Forwarding, Inc. v. United States*, 13 Cl.Ct. 510 (1987). Omni seeks to recover $4,691.64 in damages for the increase in the rates applicable to the transportation of military household goods since the tariffs were adjusted by certain ocean carriers. Alternatively, Omni claims $1,907.27 in damages for the actual increased costs it suffered as the result of tariff modifications.

In opposition, defendant filed a motion to dismiss—for lack of subject matter jurisdiction and, in the alternative, for failure to state a claim upon which relief may be granted. Defendant argued that, because plaintiff had failed to file its claim with the administrative reviewing board, *i.e.*, Military Traffic Management Command, plaintiff failed to exhaust its mandatory administrative remedies. This court denied the government's motion on August 6, 1990.[2]

A trial was held on February 28, 1991. Plaintiff contends that it is entitled to an automatic adjustment as a shipper in the same association as Four Winds Forwarding, Inc., or, alternatively, if it satisfies its burden and establishes a 2.5% increase in underlying ocean transportation costs. De-

fendant argued, conversely, that plaintiff was not entitled to an automatic adjustment in that it failed to prove the minimum requirements necessary to establish an obligation on the part of the government to adjust plaintiff's contract price based on the increased cost of underlying ocean transportation. The court holds—(i) that plaintiff was not entitled to an automatic adjustment; (ii) that consistent with our prior holding, plaintiff has a distinct evidentiary burden of proving that its costs increased by at least 2.5% and such increase occurred after the pegged quotation date (PQD), and (iii) that no other viable service was available at the former rate level. We find that plaintiff failed to meet its burden as to the foregoing by a preponderance of the evidence.

*Facts*

Omni is a private freight forwarder. As such, it is a participant in the Department of Defense (DOD) International Through Government Bill of Lading (ITGBL) program for the transportation of household goods and unaccompanied baggage between points in the continental United States and overseas. Private freight forwarders compete under this program for the right to ship the personal property of military service members, their dependents, and civilian employees of the Department of Defense.

The Military Traffic Management Command (MTMC), the manager of the ITGBL program, is responsible for directing, controlling, and supervising all of the functions incident to the acquisition of transportation for DOD freight. Shipments under the ITGBL program flow in both domestic and international commerce, but the responsibility for the solicitation of transportation rates, and the establishment of contract terms and conditions, is centralized in the MTMC.

---

**1.** Pursuant to the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), the name—"United States Claims Court"—was changed to—"United States Court of Federal Claims."

**2.** In said opinion, the court found that the ITGBL contract procedures for cost adjustments, listed in its Standing ITGBL Rate Filing Instructions and Procedures, did not require the

plaintiff to file first with the Military Traffic Management Command. Further, we held that plaintiff would be awarded relief on the merits only if it could demonstrate, at trial, that it met the substantive requirements found in the Standing ITGBL Rate Filing Instructions and Procedures, namely, demonstrating that it suffered a 2.5% increase in underlying ocean transportation costs.

Under the ITGBL program, shipments of household goods and unaccompanied baggage are tendered to a freight forwarder for movement from origin to destination under the forwarder's responsibility as a common carrier. The forwarder packs the goods in specially-designed containers and arranges for movement by marine or air carriers to transport those shipments. The selection of carriers and the route of shipment is generally left to the forwarder. The forwarder is thus viewed as a shipper in its relationship with the carriers selected and, as such, the forwarder purchases transportation services from, and pays the transportation rates charged by, those carriers.

To compete under the ITGBL program, freight forwarders, such as Omni, are required to file shipping rates with the MTMC every six months in order to become eligible for a contract award for these international shipments of personal property. These rates are known as "single-factor" rates. The single-factor rate includes all charges associated with pick up, packing, line haul, port services, over ocean transportation, residence delivery, and unpacking. It covers the total cost of shipping and is, therefore, intended to reflect, in one single dollar figure, both the expense and the profit of the freight forwarder. MTMC solicits these single-factor rates twice a year, by means of a solicitation letter, for six-month performance periods known as "volumes."

This case involves the performance of shipping services during Volume 46, which ran from April 1, 1983 to September 30, 1983 initially, but was later extended until October 31, 1983. The solicitation letter for Volume 46, issued on September 29, 1982, provided that October 29, 1982, would substantially serve as the date on which the single-factor rate cost data would be established. This date, the PQD, is the date by which all participants in the ITGBL program were required to construct their single-factor rates on the basis of costs in effect at that time, including the cost of the ocean transportation. (*See* Joint Exhibit 34 ¶ 7).

The Volume 46 solicitation included, by reference, the "Standing ITGBL Rate Filing Instructions and Procedures" (Standing Instructions) which were formulated when MTMC established the Single–Factor Rate Adjustment (SFRA) program. (*See* Joint Exhibit 2). MTMC developed the SFRA program to reimburse forwarders for legally-applicable ocean transportation rate increases that first became public knowledge after the established PQD for each volume. Freight forwarders were thus provided with a procedure whereby they could bid for contracts under the ITGBL program on the basis of ocean rates in effect on the PQD, then thereafter file for rate increases if the purchased costs did in fact increase at the time of actual shipment, subject to certain conditions, such as at least a 2.5% increase in costs, based on underlying increases that were public knowledge after the PQD, and that no other viable transportation was available at the former lower rate. The SFRA program was intended to protect ITGBL program participants from subsequent ocean rate increases that would diminish the expectations on contracts awarded to low ITGBL program bidders. It served a similar benefit to MTMC, insofar as the SFRA program encouraged forwarders to calculate their single-factor rates based upon applicable rates of underlying carriers providing the most economical, efficient, and viable service best suited to the operations of each individual ITGBL forwarder.

The provisions of the SFRA program were incorporated into the Standing Instructions. The paragraphs germane to this dispute are 2002, 2012, 3006, and 6001. They state as follows:

2002. Authorized Adjustments to the Single–Factor Rate [defined]. MTMC may authorize adjustments to the single-factor rate for changes in the cost of underlying purchased transportation.... MTMC reserves the right to determine the nature, timing, and amount of these adjustments. After a particular adjustment is authorized, the specific details concerning that adjustment will be communicated to the appropriate industry rate bureaus/associations for inclusion in the Military Basic Tender (MBT).

2012. Military Basic Tender [defined]. A tender issued by a rate publishing

association, bureau, or conference or individual carrier which contains uniform provisions, rules, and/or regulations governing the application of the single-factor rates ... and MTMC authorized adjustments to the single-factor rate. These tenders cover DOD personal property shipments moving between CONUS (Continental United States) and overseas rate areas....

3006. Authorized Adjustments to the single-factor rate—Classes 1, 2, 3 [system rate filing procedures]. To minimize uncertainty in preparing rate submissions, when authorized, adjustments to the single-factor rate for cost changes in purchased underlying transportation ... *will be automatically passed through all carriers and will not affect a carrier's relative competitive standing. Authorized adjustments to the SFRA will be processed in accordance with Chapter VI.*

6001. Requests for Rate Adjustments Due to Changes in Purchased Marine or Air Transportation Costs.

a. As a minimum, requests for the rate adjustments under the procedures herein *must* provide the following elements of information:

(1) The requested adjustment must represent a change in purchased marine or air transportation costs of no less than 2.5%.

(2) Requests for adjustment must be based on underlying rate increases that became public knowledge after the pegged quotation date.

(3) No viable underlying service at the former rate level remains....

(4) A narrative explanation of the proposed rate adjustment ... and the circumstances that resulted in the adjustments and the proposed effective and expiration dates.

(5) A proposed MBT or manual rate tender item exactly as it should appear in the tenders.

(6) Computations supporting the proposed adjustment to include "old" and "new" underlying transportation rates, conversion factors ... proposed new rates in dollars ... etc.

(7) Copies of all "expired" and "effective" tariff pages.

(8) A listing of all US flag carriers participating in the trade route applicable to the requested adjustment.

(9) The request for adjustment must be received by MTMC, Rate Acquisition Division, no later than 60 calendar days following the expiration date of the applicable volume single-factor rate.

b. MTMC will favorably consider requests for adjustments that meet the above criteria and satisfy additional administrative requirements contained herein. Requests *must* be submitted by individual carriers or associations/bureaus that are the publishing agents for the international MBT's.... Once approved a carrier must rebill to receive compensation for these adjustments. *Rebilling must include all applicable adjustments regardless of whether they result in increases or decreases to the carrier.*

c. Following consideration and approval of rate adjustments by MTMC, adjustments will be authorized by a new item in the applicable MBT's or by supplement to the manual rate tenders, as appropriate. MTMC will submit adjustments items to the bureaus and associations for inclusion in the MBT's....

Standing Instructions (*See* Joint Exhibit 2, pp. 23, 25, 46, 137–39) (emphasis added).

MTMC proposed a change to the Standing Instructions which would have required that for SFRA to be awarded to similarly-situated carriers:

(1) Copies of all Sections (sic) 409 agreements, line haul tariffs, over ocean tariffs, agency agreements and other contracts cited in the coast data reference sheets on which the carrier relied and used in calculating his rate for which he now seeks an upward adjustment must be submitted.

(2) An affidavit by carrier that the agreements and tariffs submitted pursuant to (1) above were actually and in fact relied on and used by him in formulating and calculating his rate [for] which he now seeks upward adjustment.

(*See* Joint Exhibit 2, p. 200, known as "Change 10"). However, MTMC rescinded these requirements on January 25, 1983, stating:

> After careful analysis of industry comments and our own review, it has been decided that [the cited portions above of Change 10] is not in the best interests of the industry or DOD.... Recision will become effective immediately so that requirements ... in question will not impact on Volume 46.

(*See* Joint Exhibit 2, p. 201).

Four Winds Forwarding (FWF), another freight forwarder participating in the Volume 46 shipping cycle, filed a request for a SFRA based on an increase in purchased ocean transportation costs, following all the proper procedures and fulfilling all the necessary requirements of the Standing Instructions. MTMC denied this SFRA because FWF based its single-factor rate on Freight All Kinds (FAK)[3] consolidated shipment rates which MTMC found to be inapplicable. FWF sued in the predecessor Claims Court, and Judge Tidwell held that it was appropriate for FWF to base its single-factor rate upon FAK consolidated shipment rates. Judge Tidwell so held where, on the PQD, only one of the ocean carriers' tariffs had excluded from its FAK rates the military household and unaccompanied baggage FWF had intended to ship. *Four Winds*, 13 Cl.Ct. at 515–18. It was because FWF based its single-factor rate on FAK rates that it filed for an adjustment due to increased costs.

Thus, the *Four Winds* decision concluded that all but one of the carriers used by FWF had altered their restrictions so as to exclude military household goods from their FAK rates *for the first time* after the PQD. (*See* Joint Exhibit 34, ¶¶ 12–16). Judge Tidwell awarded FWF the *increased actual costs* for purchased ocean transportation over the FAK rates that it had calculated in its single-factor rate. *Four Winds*, 13 Cl.Ct. at 518. Also, Judge Tidwell refused to award FWF the difference between the FAK rates and the new applicable rates since FWF had not *actually* paid the new rates but rather had experienced a lesser increase in costs. *Id.* at 517–19. As for the Gulf European Association Agreement No. 10270 Tariff No. 5, FMC–10, Judge Tidwell found that this tariff had already excluded military household goods from its FAK rates prior to the PQD, and did not award FWF any related costs. MTMC never authorized issuance in the MBT of the single-factor rate adjustment to Volume 46 shipments awarded by the court. *Id.* at 517–19.

Plaintiff claims that it utilized the same FAK consolidated commodity rates as did FWF during the Volume 46 period in composing its single-factor rate. The basis of this claim is premised on an affidavit admitted into evidence as Joint Exhibit 31, "for the truth of the matter asserted therein." Plaintiff claims increased costs with respect to nine shipments. The shipments were as follows:

| No. | GBL No.* | Origin* | Destination* | Origin port* | FAK rate** |
|---|---|---|---|---|---|
| 1 | FP150535 | ND | England | Baltimore, MD | $ 2248 |
| 2 | FP262694 | NC | England | Norfolk, VA | $ 2248 |
| 3 | BP128325 | CA | England | Richmond, CA | $ 3871 |
| 4 | AP357472 | CA | Germany | Oakland, CA | $ 3871 |
| 5 | CP332613 | GA | Germany | Savannah, GA | $ 1995 |
| 6 | CP400525 | GA | Germany | Savannah, GA | $ 1995 |
| 7 | NP069984 | NC | Germany | Norfolk, VA | $ 1995 |
| 8 | FP156021 | NM | Germany | Houston, TX | $ 2600 |
| 9 | CP381285 | KS | Germany | Houston, TX | $ 2600 |

*See Joint Exhibits 5–13.
**See Joint Exhibits 14–20, and 34 ¶¶ 12–16.

---

**3.** Freight All Kinds (FAK) rates are "the lowest legally applicable rates on the PQD" for the shipment of household goods in designated channel(s), *i.e.,* costs from water's edge to water's edge. *Four Winds*, 13 Cl.Ct. at 512.

Among these nine shipments, four ocean carriers' tariffs were involved; stated differently, the nine shipments were transported by the following four ocean carriers:

| Shipment No. | | Tariff |
|---|---|---|
| 1, 2 | (A) | American Coastal Line Venture Tariff No. FMC–2 |
| 3, 4 | (B) | Lykes Bros. Steamship Co. Eastbound Pacific Coast European Joint Container Tariff No. 2 FMC–145 |
| 5, 6, 7 | (C) | U.S. Lines, Inc. Freight Tariff No. FMC–146 |
| 8, 9 | (D) | Gulf European Association Agreement No. 10270 Tariff No. 5, FMC–10. |

The *Four Winds* decision held that Tariffs (A) through (C) *allowed* household goods to be included in shipments at FAK rates. *Four Winds*, at 518. However, Tariff (D) restricted household goods from its FAK rates prior to the PQD and, thus, the court *did not* permit FWF to recover costs over the FAK rates for any shipments under that tariff because that rate was not a viable rate applicable to forwarding military household goods. *Id.* at 518.

After the PQD, *all* four tariffs were amended for the first time, resulting in restrictions on FAK rates. In Tariffs (A) through (C), the amendments restricted FAK rates so that they were inapplicable to military household goods and personal effects. Tariff (D) stated more explicitly its exclusion of military household goods from FAK rates. In Section V of that tariff, prior to the PQD, a separate schedule of rates appeared which applied to military household goods and a specific statement negated the FAK rate applicability. Section V provided that—"Military household goods are exempt from the rules contained in pages 6 through 61 of this tariff." (*See* Joint Exhibit 32, p. 344). The FAK rate rules appeared on pages 48, 48–e, and 48–f. In addition, the *Four Winds* court also held that this section negated availability of FAK rates under this tariff. *Id.* at 516.

The *post* PQD restrictions in tariffs (A) through (C) made the above-referenced FAK rates suddenly unavailable to Omni and other forwarders similarly situated regarding their Volume 46 shipments. As a result, Omni, FWF, and other ITGBL carriers were unable to thereafter ship at FAK rates and were forced to incur higher household goods shipping rates, increasing their costs of purchased ocean transportation where they had previously relied on FAK rates in constructing their single-factor rates.

Given the foregoing, FWF, in filing a request for a SFRA under theses same tariffs, sought the following amounts, as adjustments, based on the increases—Tariff (A) shipments, $22.67 per net cwt (hundredweight); Tariff (B) shipments, $5.67 per net cwt; Tariff (C) shipments, $22.00 per net cwt; and Tariff (D) shipments, $20.50 per net cwt. (*See* Joint Exhibits 14–20, 34 ¶ 18.)

Omni relied on the same rates in constructing its Volume 46 single-factor rate as did FWF, which were the lowest ocean rates in effect on the Volume 46 PQD. Thus, the shipment adjustments that Omni likewise requests here are:

| GBL No. | Shipments | Omni requests*: | Omni's net cwt** | Adjustment Requested |
|---|---|---|---|---|
| FP150535 | A | $22.67 | 44.43 | $1,007.23 |
| FP262694 | A | $22.67 | 27.95 | 633.63 |
| BP128325 | B | $ 5.67 | 55.80 | 316.39 |
| AP357472 | B | $ 5.67 | 31.40 | 178.04 |
| CP332613 | C | $22.00 | 36.70 | 807.40 |
| CP400525 | C | $22.00 | 14.10 | 310.20 |
| NP069984 | C | $22.00 | 13.00 | 260.00 |
| FP156021 | D | $20.50 | 50.40 | 1,033.20 |
| CP381285 | D | $20.50 | 7.10 | 145.55 |
| | | | Total | $4,691.64 |

\* per net cwt, Joint Exhibits 14–20, 34 ¶ 18.
\*\* per container, Joint Exhibits 5–13.

---

These are the same rate differences per net cwt between FAK rates and the *new*, post PQD, rates that FWF claimed. Joint Exhibits 14–20. In the alternative to the foregoing, Omni claims the difference between FAK rates and its *actual* payments to the ocean carriers.

| GBL No. | % Container Omni's* | × | Actual payment-FAK** | = | Actual Cost Increase |
|---|---|---|---|---|---|
| FP150535 | 42.9 | | $1037 | | $444.87 |
| # FP262694 | 18.5 | | $1037 | | $191.85 |
| | 6.0 | | $1037 | | $ 62.22 |
| # BP128325 | 22.1 | | $ 619 | | $136.80 |
| | 28.2 | | $ 619 | | $174.56 |
| AP357472 | 28.1 | | $ 619 | | $173.94 |
| # CP332613 | 12.6 | | $ 765 | | $ 96.39 |
| | 14.3 | | $ 765 | | $109.40 |
| | 11.5 | | $ 765 | | $ 87.98 |
| # CP400525 | 8.1 | | $ 765 | | $ 61.97 |
| | 3.2 | | $1290 | | $ 41.28 |
| NPO69984 | 13.8 | | $ 551 | | $ 76.04 |
| FP156021 | 39.8 | | $ 594 | | $236.41 |
| CP381285 | 6.8 | | $ 200 | | $ 13.60 |

# split shipments.
\* Joint Exhibit 34 ¶ 35. Calculated by multiplying Omni's gross weight in each container by the total gross weight of each container. See Joint Exhibits 5–15 for gross weights per container.
\*\* Joint Exhibit 34 ¶ 34. Calculated by subtracting the FAK rate from the actual rate paid. See Joint Exhibits 5–13 for actual payments.

---

## Contentions of the Parties

### Plaintiff

Plaintiff asserts four major contentions in support of its claimed entitlement to relief. First, plaintiff contends that it properly relied on FAK rates in developing its single-factor rate, even with respect to the Gulf shipments. Further, plaintiff argued that—the FAK rates were available to all shippers of military household goods prior to the PQD, whether from the Gulf ports or the other ports involved in the nine disputed shipments, and it was capable of meeting the requirements of the FAK rates.

Its second contention was that once FWF received an adjustment for its reliance on FAK rates, Omni was entitled to an automatic adjustment due to the changes in the rates applicable to shipment of military household goods because the Standing Instructions, § 3006, indicated that such adjustment should be awarded. Omni also argued that because FWF received an adjustment, though it was court ordered, § 3006 requires the MTMC to award a similar adjustment to all other similarly-situated shippers that transported goods through the same ocean channels. This process was compelled in order to ensure that FWF did not receive a competitive advantage, to the detriment of all other similarly-situated shippers, while at the same time obviating the necessity of multiple filings with the MTMC based upon the same set of circumstances.

Alternatively, plaintiff's third contention is that, if this court reads §§ 3006 and 6001

of the Standing Instructions as *not* providing for an automatic adjustment to similarly-situated shippers, then we should award relief to Omni because it is able to satisfy the necessary basic requirements for a similarly-situated shipper who receives an adjustment, without having to file formally with the MTMC for such increase. Omni argued that, because this court decided in its opinion addressing defendant's motion to dismiss that it was not required to file its own separate SFRA request with the MTMC based on ocean carrier tariffs identical to those previously and timely filed by a similarly-situated carrier, *i.e.*, FWF, it is entitled to relief from this court *so long as it is able to prove* the necessary elements prescribed in the Standing Instructions. Those elements required to be proven are as follows: (i) a 2.5% increase in the underlying costs of ocean transportation; (ii) the increase must have occurred *after* the PQD; and (iii) there were no other carriers that could provide the service at the former rate level after the PQD.

Finally, Omni contended, with respect to its damages, that it was not only entitled to the increased costs it actually incurred because of the change in ocean transportation costs (*i.e.*, $1,907.27), but that it was also entitled to the greater amount ($4,691.64) which is the difference between the initial applicable FAK rate and the new rates that became applicable after the PQD.[4]

### Defendant

Conversely, defendant's four contentions substantially mirror those of plaintiff. Defendant contends that Omni failed to carry its burden to prove that it met the requirements entitling it to utilize FAK rates prior to the PQD, and that it *actually* relied on such rates in formulating its single-factor rate. In addition, defendant alleges that, even assuming reliance, plaintiff failed to establish that it was reasonable in relying on the FAK rates. In short, defendant argues that Omni cannot show that it was sure that it could fulfill the FAK rate requirements each ocean carrier called for in its tariffs.

Defendant's second contention was that Omni was in error in its interpretation of

the Standing Instructions, particularly §§ 3006 and 6001. It argues that these sections cannot be read so as to preclude the requirement of any showing, by other shippers, that they actually suffered such costs; but rather, they only preclude other shippers from the procedural requirements of § 6001, that are placed on the *initial* shipper, who receives an "authorized" adjustment from the MTMC.

Next, defendant contends that plaintiff was not entitled to any adjustment because it cannot meet the requirements necessary for an adjustment for "other shippers" similarly situated, *i.e.*, plaintiff should not *automatically* receive its SFRA. Plaintiff has three evidentiary burdens, the first of which is to prove a 2.5% increase in costs. Defendant, noting that this court held that such requirement was a necessary showing for Omni in its opinion addressing defendant's motion to dismiss, argued in its first contention that Omni was unable to prove that the FAK rates were properly applicable to their shipments because they could not prove they met the listed requirements in each tariff. Therefore, defendant contends that Omni cannot demonstrate a 2.5% increase in costs by showing that the FAK rates became suddenly inapplicable after the PQD because they were unable to show their initial applicability prior to the PQD.

Defendant's final alternative contention was that, if plaintiff were entitled to damages, they would be restricted to actual cost increases incurred, as held by Judge Tidwell in the *Four Winds* case, and not the difference between FAK rates and the new rates applicable after the tariff changes occurring after the PQD.

### *Issues*

There are two main issues that are raised and will be addressed in this opinion. First, we will address the question—whether the Standing Instructions permit an automatic adjustment passing to all shippers similarly situated to FWF (*i.e.*, shipped with the same underlying ocean carriers under the same tariff schedules), where the initiating shipper filed a SFRA, and, after litigation, was awarded such adjustment by the court. The second question the court

---

**4.** We note that plaintiff identified, on its pretrial witness list, two witnesses whom it thereafter failed to call to testify at trial. Both such witnesses, Messrs. Kenneth Garrison and Robert Kelly, were identified in Mrs. Jean Kelly's (plaintiff's only witness) testimony. The record establishes that it is a fact that Robert Kelly is

Jean Kelly's husband and an employee of Four Winds Moving and Storage, and Mr. Garrison was an employee of Movers Port Service, Omni's principal port agent. Joint Exhibit 31 ¶¶ 10–12, 15. Mrs. Kelly testified that she relied on their advice; however, neither was called to testify in corroboration of her testimony.

will address is—concluding that there is no *automatic* adjustment passing to other associated shippers, whether Omni has established that it meets the operative requirements listed in the Standing Instructions, which were incorporated into the contract. In short—has Omni demonstrated eligibility for an adjustment as an "other shipper" within § 3006 of the Standing Instructions that need not have timely filed with the MTMC for a separate adjustment because of FWF's timely filing? There is a third issue, which the court will not reach because it is not dispositive to its holding, and that is, if plaintiff prevails on the liability issue—whether it is entitled to be awarded only actual costs or the full damages it seeks.

*Discussion*

For the reasons explicated hereinafter, the court finds that plaintiff has failed to meet its burden of proving the government's liability by a preponderance of the evidence. This is so because we read the relevant contract provisions contained in the Standing Instructions as mandating that the plaintiff, Omni, must meet certain minimum requirements in order to receive a benefit from the "coat-tails" of an adjustment awarded to a similarly-situated, associated shipper. This shipper, FWF, was previously awarded its adjustment by mandate of court. The critical point here is that these provisions do not permit *automatic* adjustments to "other shippers" (*i.e.*, "tag-along" shippers) merely because they are associated with FWF, and relied on the same underlying ocean carriers for their disputed shipments. Therefore, we hold that the crucial, indispensable, evidentiary requirement on Omni is an affirmative demonstration by the requisite quantum of proof that—(i) a 2.5% increase in costs of ocean transportation was incurred; (ii) the increases became public knowledge after the pegged quotation date; and (iii) no other viable underlying service was available at the former fact rate level.

The court finds that Omni failed to prove, by a preponderance of the evidence, that it met the substantive requirements placed on it by the Standing Instructions because it did not establish the necessary elements to demonstrate that no other viable underlying service at the former rate level remained. Though the court finds that Omni was able to adduce evidence that it did rely on FAK rates in constructing its single-factor rate, and that such rates did become inapplicable after the PQD, the court is unable to award relief to Omni because it failed to prove, by a preponderance of the evidence, the third necessary requirement.

### A. *The Scope of Contract Provisions*

Omni's theory of relief is based solely on breach of contract. It is an undisputed fact that the remedial provisions of the Standing Instructions were incorporated into the solicitation and, therefore, became contractual provisions. *See* Joint Exhibit 34 ¶ 7. Given such, Omni alleges that the government failed to award them the rate adjustments to which they were entitled under the Standing Instructions. Therefore, it avers that the government breached provisions of the contract inasmuch as it previously agreed, for valuable consideration, to do a specific thing and it failed so to do. *Indiana v. United States*, 26 Ct.Cl. 583, 607 (1891), *aff'd*, 148 U.S. 148, 13 S.Ct. 564, 37 L.Ed. 401 (1893).

At bar, the Standing Instructions provide for single-factor rate adjustments in Chapters II, III, and VI. In explicating a SFRA, § 2002 states that the MTMC "may authorize adjustments to the single-factor rate for changes in the cost of underlying purchased transportation." The contract also speaks to the Military Basic Tender (MBT) and provides that, once "authorized," the adjustment may be published in a tender issued by a rate publishing association/bureau or conference or individual carrier. Addressing "authorized adjustments to the single factor rate," §§ 3006 and 6001 detail the requirements and procedures to which shippers must adhere in order for the government, via the MTMC, to be obligated to the shipper for rate adjustments.

Under the provisions fixing the government's obligation to make adjustments to the single-factor rate, the Standing Instructions generally require—that a shipper demonstrate that its costs increased by more than 2.5%; that such increases occurred after the PQD; that no other viable service was available after the PQD at the former rate level; and that, by *submitting requests* and proof in writing, the government becomes obligated to make the adjustment payment to the contractor. (Standing Instructions, § 6001(a)). Where the government fails to do so, it is in breach. *Indiana*, 26 Ct.Cl. at 607. In 1984, FWF addressed all necessary proof and met the minimum requirements detailed in the Standing Instructions (the contract). Nevertheless, the government re-

fused to make the payment adjustment due to a dispute over the legality of the use of the FAK rates in general. That is not an issue in the present case. This court now focuses on these provisions as they impact on other shippers either associated with or similarly situated to FWF that would have filed for a rate adjustment request with the MTMC had it properly awarded FWF its adjustment.

■ We initially observe that the operative provisions of the contract address adjustments to the single-factor rate, which speak to "automatically pass[ing] through" to "all carriers" only where initial adjustments are "authorized." Section 3006 states, in relevant parts, as follows:

> To minimize uncertainty in preparing rate submissions, when authorized, adjustments to the single-factor rate for cost changes in purchased underlying transportation ... will be automatically passed through all carriers....

(emphasis added). The threshold question is "authorized" by whom, to which we say the contract implicitly states authorized by MTMC. MTMC awarded that adjustment to FWF only upon court order. Thus, while FWF received an adjustment for filing a request, it did not authorize, i.e., approve, the adjustment within the plain meaning of the foregoing contractual provisions. We, therefore, read the FWF circumstance not to be within the unambiguous contextual meaning of the statutory term "authorized." Support for this construction is found in George Hyman Const. Co. v. United States, 832 F.2d 574, 579 (Fed.Cir.1987), wherein it is stated:

> It is well established that where, as here, the provisions of a contract are phrased in clear and unambiguous language, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties."

To be entitled to adjustments that "will be automatically passed through all carriers," we believe that authorization, in the context of the statute, requires that said adjustment must be awarded to the shipper by MTMC, and not by judicial mandate, in accordance with procedures set out in the Standing Instructions and the procedural requirements of Chapter VI. That chapter is specifically referenced, and the only relevant provision for changes in purchased ocean transportation is § 6001. In short, "authorized" in the context of these two sections, i.e., §§ 3006 and 6001, means approved adjustments by the MTMC. While § 3006 does not clearly indicate that an "authorized" adjustment does not embrace a court-mandated adjustment, read in conjunction with § 6001, that is the clear meaning as we read it. This is so because the procedural requirements listed in § 6001 clearly do not contemplate involuntary adjustments (court mandated) by the MTMC. No matter how clear the meaning of the term may be when read in isolation, courts are duty bound to give effect and to interpret so as to harmonize clauses of the contract and give meaning to it as a whole. Ludka v. United States, 24 Cl.Ct. 544 (1991); and Petrofsky v. United States, 616 F.2d 494, 503 (Ct.Cl.1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1488, 67 L.Ed.2d 618 (1981). Therefore, an analysis based upon these provisions will be by analogy only, because the provisions do not address the precise situation between Omni and the MTMC.

This court, in its opinion addressing defendant's motion to dismiss, held that Omni had stated a justiciable claim and was entitled to litigate, de novo, the merits under the SFRA program. We found that Omni could properly seek relief here based on FWF's request for a SFRA and the award made by Judge Tidwell, so long as the SFRA program requirements were met. Omni Moving & Storage of Virginia v. U.S., 21 Cl.Ct. 224 (1990). The holding in that opinion was based solely on the theory that Omni was not required to file its own request with the MTMC because MTMC had initially properly granted FWF its relief. We held previously that "if MTMC had properly approved the adjustment requests submitted by Four Winds as required [by the Standing Instructions,] those requests would have been published in the MBT, and Omni would have then been entitled to bill its increased transportation costs under those changes." Omni, 21 Cl. Ct. at 235. In this respect, we agree with plaintiff that it necessarily follows that Omni should be placed in the same position as it would have been in if MTMC had initially acted lawfully and authorized publication in the MBT of the SFRA's requested by FWF.

The stated purpose of the adjustment that is awarded "all carriers" who do not file for a separate SFRA within the prescribed period, and who follow the prescribed procedures, is noted clearly in § 3006—so as "not [to] effect a carrier's

relative competitive standing" and to provide a disincentive to duplicative filings based on the same rate increases. The government's liability is fixed within these provisions, and their requirements will be the focus of the discussion *infra*.

### B. *Automatic Adjustments to the Single–Factor Rate*

■ Omni's initial theory for recovery is that the government is obligated to award adjustments to all carriers that are affected by a rate change that leads to an adjustment award to a shipper that timely and properly filed for a SFRA based on the clear language of § 3006. Based on that theory, Omni posits that it must only prove that it is similarly situated to FWF who filed for, and received, an adjustment based on changes to tariffs that both carriers utilized in the Volume 46 shipping cycle. Plaintiff argued that showing that it is similarly situated, all the requirements were satisfied under the SFRA program. Citing this court to a general statement addressing defendant's motion to dismiss, Omni focuses on one aspect of our holding, that "the adjustments ultimately ordered by the predecessor Claims Court in *Four Winds* will automatically inure to the benefit of all similarly situated forwarders." *Omni*, 21 Cl.Ct. at 229–30. Omni misconstrues the court's holding. While we held that the SFRA program does apply, we also specifically stated that there were evidentiary requirements remaining which were the obligation of similarly-situated carriers as a condition of the automatic pass-through:

> If Omni is able to prove that it suffered increased costs in excess of 2.5% at a trial on the merits, it will be entitled to the relief sought in its complaint. This is true because, upon a showing that it shipped in the same channels as Four Winds, it follows that Omni experienced the same increased purchased ocean transportation costs incurred by Four Winds. For these increased costs, Omni, like Four Winds, should be compensated *if they are proven to be meritorious.*

*Omni*, 21 Cl.Ct. at 236 (emphasis added).

FWF and Omni were associated carriers; this is not a fact in dispute. *See infra.* By producing the same evidence proffered by FWF, buttressed by the opinion of Judge Tidwell, Omni argued that it could establish that because FWF suffered an increase in underlying ocean transportation costs during the Volume 46 rate cycle, so did Omni.

However, Omni misreads § 3006 and fails to prove through the contract provisions, *i.e.*, the Standing Instructions, that recovery for similarly-situated carriers is truly per se "automatic." In fact, Omni's theory totally disregards the prior holding of this court. We specifically held that there *was* an evidentiary hurdle over which Omni must scale as a condition to automatic recovery. *Omni*, 21 Cl.Ct. at 236. Had we not found such a burden, there would have been no need to proceed to trial. In fact, that is the precise reason the trial was held. Omni failed to establish error in this court's holding that an evidentiary showing of increased costs of purchased marine transportation greater than 2.5% was required. It simply missed the crucial point of our decision in making this argument. Consistent with the prior opinion, this court finds that the clear meaning of the Standing Instructions provisions, relevant to SFRA, indicates an evidentiary burden on other carriers who seek adjustments based on filing requests of a similarly-situated carrier. *Omni*, 21 Cl.Ct. at 236.

As previously noted, the contract provisions which dictate the procedure for requesting a SFRA and for automatically passing on such adjustments to other carriers are §§ 3006 and 6001 of the Standing Instructions. Section 6001 sets up the procedures and the requirements to be met in connection with requests for rate adjustments due to changes in purchased marine transportation. Section 3006 addresses authorized adjustments to the single-factor rate. The language of § 3006 specifically states that *"when authorized*, adjustments ... will be automatically passed through all carriers...." Authorized adjustments to the SFRA will be processed in accordance with [§ 6001]." The language unequivocally directs the reader to § 6001 in order to determine *how adjustments are authorized.* Thus, to be authorized, adjustments that "pass through all carriers" *must* comply with § 6001 if related to purchased marine transportation costs. It would, therefore, be improper to read § 3006 in isolation and without regard to the requirements of § 6001. Contract provisions cannot be read, as previously noted, in isolation, but rather must be read in the context of all provisions to interpret the contract as a whole. *Muniz v. United States*, 972 F.2d 1304 (Fed.Cir.1992); *Ludka, supra;* and *Petrofsky*, 616 F.2d at 503.

Section 6001(a) sets out a list of minimum requirements for authorized rate adjustments. Among those are three substantive requirements:

6001(a)(1): "[t]he requested adjustment must represent a change in purchased marine or air transportation costs of no less than 2.5%";

6001(a)(2): "[r]equests for adjustment must be based on underlying rate increases that became public knowledge after the pegged quotation date"; and

6001(a)(3): "[n]o viable underlying service at the former rate level remains...."

Section 6001(b) further establishes administrative requirements for requests for adjustment and, in doing so, fixes which requirements are obligations of all carriers on the affected trade route. This section requires that "Requests be submitted by individual carriers or associations/bureaus that are publishing agents for the international MBT's." Section 6001(b) also states that, *"[o]nce approved, a carrier must rebill to receive compensation for these adjustments. Rebilling must include all applicable adjustments regardless of whether they result in increases or decreases to the carrier"* (emphasis added). The court reads these sections to require all other carriers to rebill for any adjustment received by a carrier who was similarly situated with regard to increased costs of a common trade route. To interpret §§ 3006 and 6001 such that this clause only applies to the initial carrier filing for a SFRA would render part of the clause meaningless. No shipper would *initially* file and bring attention to the MTMC need for a downward adjustment so § 6001(b) clearly contemplates *other* shippers receiving compensation for adjustments. Therefore, these shippers are bound by § 6001's substantive requirements. An interpretation that gives a reasonable meaning to all parts of a contract will be preferred to one that leaves portions of the contract meaningless. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir. 1983). Further, a preferred interpretation of a contract will give meaning to all parts of the contract, without reading single phrases out of context or to the exclusion of others. *Kiewit/Tulsa–Houston v. United States*, 25 Cl.Ct. 110, 118 (1992). *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388, 351 F.2d 972, 979 (1965). "The court should reject any interpretation which would render it meaningless, useless, ineffective, or superfluous." *Boehm v. United States*, 22 Cl.Ct. 511, 516 (1991).

This court reads § 6001, as a whole, to require the establishment of the substantive requirements in § 6001(a) as a prerequisite for participation in any subsequent adjustment to MBT's. A carrier must, therefore, demonstrate the minimum cost differentials. We note also that § 6001 is more specifically tailored to adjustments resulting from purchased marine transportation costs, whereas § 3006 is more general, applying to all "authorized" adjustments. It is an axiomatic rule of contract construction that specific clauses prevail over general clauses where clauses are irreconcilable, but where both clauses can be given reasonable effect, both are to be retained. *Ohio Power Co. v. F.E.R.C.*, 744 F.2d 162 (D.C.Cir.1984); *Dravo Corp. v. United States*, 202 Ct.Cl. 500, 480 F.2d 1331 (1973). Thus, we find that plaintiff must meet the substantive requirements of § 6001, such as demonstrating a 2.5% increase in underlying ocean transportation costs, after the PQD, in order to satisfy its contractual obligations and to fix liability on the government to meet its payment obligation.

Plaintiff made one additional argument in support of its position. It contends that the recision of a proposed change, Change 10, which would explicitly place a substantive requirement on "tag-along" shippers indicates the intention that the MTMC did not desire a forwarder to show that its requested SFRA was based on underlying ocean carrier rates for which the adjustment was being sought. Defendant contends that such an implication cannot be reached. The court refuses to speculate as to whether MTMC intended to clarify or change its position as to the matter.

There are other substantive provisions also applicable to Omni and other "tag along" shippers. While rules of contract construction require these "tag-along" carriers to make a showing of substantive requirements, it is also equally clear that the procedural requirements of § 6001(a) do not apply. To interpret the provision differently would render § 3006 moot. Again, an interpretation that gives a reasonable meaning to all parts of a contract will be preferred to one that leaves portions of the contract meaningless. *United States v. Johnson Controls, Inc., supra.*

## C. *Omni's Burden of Proof*

■ We have so far concluded that the Standing Instructions clearly require that all contractors must make the showing of increased costs suffered. In order for Omni to successfully prove that the contract was breached, it must prove that the government's liability to adjust its single-factor rate was fixed, inasmuch as it satisfied its own contractual obligations by meeting the necessary substantive requirements of § 6001(a). While we find, as discussed *infra*, that plaintiff did succeed in meeting the requirements of §§ 6001(a)(1) and (a)(2), we also find, *infra*, that it failed to meet the requirement of § 6001(a)(3) and, therefore, failed to establish its contractual entitlements fixing a burden on the government to award relief to plaintiff.

Initially, Omni must demonstrate, to be entitled to "tag-along" relief—that it was a similarly-situated carrier, that it transported goods in the same channels, and that it was subject to MBT amendments resulting from FWF adjustments. Omni meets such requirements by illustration of an application of an amendment to the MBT applicable to Omni during Volume 46 and prior to filing its complaint here. (*See* Joint Exhibit 32.) We analogize Omni's situation to that where FWF's claim had been approved by MTMC. We found that such an analogy would allow Omni relief in such instance if it were entitled to relief in the case where FWF's claim was in fact awarded by MTMC. *Omni*, 21 Cl.Ct. at 236. Omni and FWF are members of the same association, *i.e.*, the Household Goods Forwarders Association of America, Inc., and Omni and FWF previously participated in another MBT during Volume 46, MBT 1–H, which canceled MBT 1–G. (*See* Joint Exhibit 32.) Omni's association with FWF is a fact which is not disputed.

Having proven in the joint exhibits that Omni was associated with FWF within the meaning of the Standing Instructions and for the purposes of application of MBT amendments, Omni must still meet the substantive requirements contained in § 6001(a). These requirements are: an increase in purchased marine transportation costs of more than 2.5%; requests for adjustments based on underlying rate increases that became public knowledge after the PQD; and no viable underlying service at the former rate level remaining.[5] (Standing Instructions §§ 6001(a)(1)–(a)(3)).

First, Omni must demonstrate that its purchased marine transportation costs increased more than 2.5%. *See Omni*, 21 Cl.Ct. at 236. In accomplishing this task, Omni must demonstrate the rate that it relied upon in formulating its single-factor rate. Next, Omni must demonstrate the rate it *actually* paid to the ocean carrier, establishing that the difference in the two rates was at least 2.5% more than the original rate on which they relied. (Standing Instructions § 6001(a)(1)). Omni met both prongs of this two-step analysis, proving that it relied upon a specific rate in formulating its single-factor rate.

The government argues that Omni did not establish at trial that it actually relied on FAK rates in constructing its single-factor rate because it could not produce any documentary evidence of its rate formulation calculations. Further, defendant argued that the proof offered by Omni, in the form of the testimony of its sole witness, Mrs. Kelly, president of Omni, did not succeed in overcoming plaintiff's preponderance of the evidence burden to establish this fact. However, this court finds that defendant conceded to this very fact, first by allowing the admission of an affidavit of Mrs. Kelly, prepared in response to Defendant's Motion to Dismiss, as Joint Exhibit 31, and then by allowing the court to admit it "for the truth of the matter asserted therein." (Tr. at 88.)

The court finds probative evidence of Omni's reliance on FAK rates in its formulation of its single-factor rate as contained in Joint Exhibit 31, ¶¶ 8–10, wherein it is stated the following:

8. I [Mrs. Jean Kelly, president of Omni] then *constructed Omni's Volume 46 rates on the basis of the FAK tariffs*, which provided the lowest ocean rates.

---

**5.** Another element of proof Omni potentially must satisfy is the time requirement of § 6001(a)(9) which requires that filing occur within 60 days of the termination of the shipping cycle. While this is clearly a procedural requirement of the initial filer and would appear to be duplicative among "tag along" carriers, it does implicate a requirement among "tag

alongs" such as Omni who did not make an initial filing because of knowledge of another shipper's timely filing. Omni claims it did not file because it knew that FWF planned to file. There is some proof of this fact found in Joint Exhibit 31, the affidavit of Mrs. Jean Kelly, at ¶¶ 10, 11, 12 and 15.

The FAK rates that Omni relied on were set forth in the following tariffs....

9. Subsequent to October 29, 1982, the pegged quotation date for Volume 46, *the FAK rates on which Omni relied in constructing its pertinent Volume 46 single-factor rates*, were restricted against the shipment of household goods as follows....

10. As a result of the above restrictions against the shipping of household goods at the FAK rates as I had intended, Omni had to ship Volume 46 shipments of household goods at higher ocean rates applicable to household goods only. At that time, I was aware that the other customers of MPS, including Four Winds, had incurred the same increased costs.

(emphasis added). This and all the other trial exhibits were admitted into evidence as joint exhibits, by motion of the defendant, and without the objection of either party during the trial (Tr. at 88). We believe that a joint trial exhibit is simply a euphemism for a stipulation of the parties.[6] It is a matter of routine practice for courts to admit stipulations into evidence as "joint exhibits." *See Skaradowski v. United States*, 471 F.2d 627, 631, 200 Ct.Cl. 488 (1973); *Tenneco, Inc. v. United States*, 17 Cl.Ct. 345, 347 (1989), *aff'd* 899 F.2d 1227 (Fed.Cir.1990); *Tucker v. United States*, 8 Cl.Ct. 575, 586 (1985); *Cotter & Company and Subsidiaries v. United States*, 6 Cl.Ct. 219, 220 (1984). Because it is a stipulation and because defendant did not object to its admission "for the truth of the matter asserted therein" (Tr. at 88), defendant necessarily concedes every fact stated in Joint Exhibit 31. Thus, since the defendant allowed this court to receive into evidence the affidavit of Mrs. Kelly, prepared in response to Defendant's Motion to Dismiss for the truth of matter asserted therein, it is, therefore, bound by all statements of fact contained therein.

Defendant concedes that the affidavit was admitted into evidence, arguing, however, that it is not established that defendant agreed to the truth of every statement contained therein. Defendant cites two cases for the proposition that this court should not consider the facts contained in Mrs. Kelly's affidavit to be conceded by the defendant. First, defendant cites *LaBelle v. McCauley Industrial Corp.*, 649 F.2d 46 (1st Cir.1981), wherein the court held that plaintiff did not concede to the truth of answers defendant gave to interrogatories merely because plaintiff admitted such into evidence. *LaBelle*, 649 F.2d at 49. That case is distinguishable. Plaintiff, in that case, submitted into evidence answers to interrogatories given by defendant to demonstrate certain points about the answers, and the court held that plaintiff was not bound by every fact that was contained in those interrogatories. *Labelle*, 649 F.2d at 49. There, the party offering the exhibit on its own requested that it be admitted for a limited purpose. *Id.* Nothing in the decision indicates that the exhibit was ever admitted at trial, as here, "for the truth of the matter asserted therein," nor was there any indication that the exhibit was a "joint exhibit," tantamount to a stipulation. *Id.*

Similarly, in *Jerrold Elecs. Corp. v. Wescoast Broadcasting Co.*, 341 F.2d 653 (9th Cir.1965), *cert. denied*, 382 U.S. 817, 86 S.Ct. 42, 15 L.Ed.2d 64 (1965), cited by defendant, the court ruled that where plaintiff admitted into evidence certain correspondence of the defendant to establish certain facts, plaintiff did not concede to every fact contained in the documents where such documents were originally designed to serve the other party. *Id.* at 665. Again, in that situation the documents in question were not *"joint exhibits"* and there is no indication that, at trial, the parties allowed the judge to admit such evidence "for the truth of the matter asserted therein" without objection. *Id.* at 665. Against this background, therefore, the court is not persuaded that Mrs. Kelly's affidavit, Joint Exhibit 31, should be taken as anything less than a rendition of facts conceded as true by the defendant as well as by the plaintiff.

Notwithstanding the foregoing, defendant argues that even if this court were to consider the affidavit of Mrs. Kelly as establishing all statements contained therein, the court must still weigh the probative value of the factual declarations against plaintiff's failure to meet its overall evidentiary burden. Here, of course, plaintiff's burden is proof by a preponderance of the evidence. In civil suits between two private parties for money damages, the appropriate burden requires that the trier of fact

---

6. *Black's Law Dictionary,* 5th Edition, defines a stipulation as an "... agreement, admission, or confession made in a judicial proceeding by the parties ... or their attorneys."

*must be convinced* "that the existence of a fact is *more probable* than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [trier of fact] of the fact's existence." *In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1969) (Harlan, J., concurring), citing F. James, Civil Procedure 250–51 (1965) (emphasis added). *See Hendricks v. United States*, 14 Cl.Ct. 143, 148 (1987); *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl.Ct. 193, 218 n. 251 (1987).

In addition to the foregoing, defendant argues that, given the plaintiff's failure to call two identified corroborating witnesses, and in light of the fact that Mrs. Kelly failed to orally *assert* in any of her trial testimony, that she actually *relied* on FAK rates in formulating the single-factor rate, plaintiff has not proven that it is more probable than not that Mrs. Kelly relied on FAK rates in formulating Omni's single-factor rate. We do not agree. The court finds that where both parties have conceded to the truth of the assertions in the record, as a matter of law, *it is* more probable than not that the facts contained in those assertions, *i.e.*, judicial admissions, are true.[7] A stipulation conceding, for the purposes of the trial, the truth of some alleged fact has the effect of a confessory pleading, in that the fact is thereafter to be taken for granted. Wigmore, Evidence, § 2588; *Alamo v. Del Rosario*, 98 F.2d 328, 330 (D.C.Cir.1938). The foregoing being tantamount to a judicial admission, this court stated in *Deluxe Check Printers, Inc. v. United States*, 14 Cl.Ct. 782, 794 (1988), citing to *Hill v. FTC*, 124 F.2d 104, 106 (5th Cir.1941), that:

> Judicial admissions are proof possessing the *highest possible probative value.* Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them.

(emphasis added). Plaintiff has, therefore, succeeded against this background in meeting its burden of proving that it did rely on

FAK rates in formulating its single-factor rate.

■ Having satisfied this court of the first part of our two step inquiry, i.e., that Omni relied on FAK rates in formulating its single-factor rate, Omni must now demonstrate that rates paid to ocean carriers were 2.5% greater than FAK rates. It was also stipulated that this was a rate that was more than 2.5% greater than the FAK rates which were no longer available to shippers moving military household goods. (Joint Exhibit 34, ¶ 30). Thus, Omni meets its obligation of proof under § 6001(a)(1).

■ The next substantive burden on plaintiff derives from § 6001(a)(2). Here, plaintiff must demonstrate that the requested adjustment stemmed from increases that became public knowledge *after* October 29, 1982, the pegged quotation date. Plaintiff was relieved of this burden by a judicial admission contained in Joint Exhibit 31. As stated previously, statements made by plaintiff in its affidavit, which were admitted into evidence as a joint exhibit, tantamount to stipulations, become judicial admissions of both parties. Therefore, the statement contained in Mrs. Kelly's affidavit, Joint Exhibit 31, ¶ 9, is a judicial admission. Paragraph 9 states:

> *Subsequent to October 29, 1982, the pegged quotation date for Volume 46,* the FAK rates on which Omni relied in constructing its pertinent Volume 46 single-factor rates, were restricted against the shipment of household goods. ...

Given the foregoing probative evidence, we hold that the requirement of § 6001(a)(2) has also been established.

Finally, plaintiff is required to establish that there was no "viable" underlying service at the former rate level existing after the pegged quotation date, the requirement contained in § 6001(a)(3). Viable service is defined in § 6001(a)(3) of the Standing Instructions as follows: (i) at least two scheduled sailings per month; (ii) such sailings are to and from at least two ports in the

---

7. The court notes here that plaintiff would have failed to meet its burden of proving that it did rely on the FAK rates in formulating its single-factor rate had Mrs. Kelly's affidavit not been offered into evidence by defendant's counsel, with the consent of plaintiff, as a joint exhibit, tantamount to a stipulation. Had the affidavit not been offered in such manner, it most certainly would have been denied admissibility as rank hearsay. Plaintiff did not persuade this

court through the *testimony* of its only witness, Mrs. Jean Kelly, that it truly relied on the FAK rates. It succeeded in meeting that burden *solely* through the admission of Ms. Kelly's affidavit *as Joint Exhibit 31.* In fact, Mrs. Kelly never *actually testified* that she did, in fact, rely on such rates. Plaintiff's direct examination was lacking in this respect, as this was the only reason for Mrs. Kelly's testimony, the only testimony offered at trial.

**692**

Continental United States; and (iii) such sailings have an average transit time of no more than 130% of the average schedule U.S. Flag liner service in the same routes. No testimony was adduced as to the three elements contained in this definition, *supra.* (Tr. at 1–199.) The court does note, however, the following testimony, adduced from Mrs. Kelly, on cross-examination:

> Q. After the ocean carriers revised their tariffs, [Mrs.] Kelly, did you contact any other ocean carriers and ask whether they would provide ocean transportation at the rate that you claim to have based your single-factor rate on?
> A. No, I did not. They had a published rate for military household goods and they are *normally* very strict on sticking to that.

Tr. at 71 (emphasis added). Also—

> Q. Did you talk to any ocean carriers about whether—whether you were going to be able to ship household goods at these rates?
> A. Not that I recall.

Tr. at 44. The court finds, on the proof, that there is a want of evidence in the record by the requisite quantum to support a finding that no viable underlying service at the former rate level existed as defined in § 6001(a)(3).

We recognize the Stipulation of Facts, submitted by the parties jointly on November 19, 1990, ¶ 18, which states:

> As a result of the unavailability of FAK ocean rates during Volume 46, one ITGBL carrier, Four Winds Forwarding, Inc. (Four Winds), filed requests with MTMC for single-factor rate adjustments pursuant to paragraph 6001 of MTMC's Standing Instructions.

We find that the implication of this sentence does not, *ipso facto*, meet the requisite quantum of proof necessary to establish the substantive element as delineated in § 6001(a)(3). Mere implication, without any affirmative demonstration of the individual elements of the definition given to "viable service" by § 6001(a)(3), is not proof that establishes the fact to be *more probable than not.* The court also recognizes that Omni presumably relied on the decision of the court in *Four Winds.* Since FWF recovered its adjustment award from MTMC, it is probable that Omni believes that that necessarily indicates that no viable underlying service was available during Volume 46, and therefore none was available to Omni as well.

This premise might have salvaged Omni's failure to establish proof of this element had the court in *Four Winds* reached a conclusion as to this fact. However, the *Four Winds* court makes no mention of the unavailability of viable underlying service, finding only that:

> Subsequent to the submission of plaintiff's bids, and during the term of Volume 46, the tariffs were changed by the ocean carriers to preclude plaintiff's use of FAK rates for military HHG [household goods]....

*Four Winds*, 13 Cl.Ct. at 512. We also recognize that, in its holding, the court does find that "plaintiff satisfied all SFRA requirements established by MTMC with regard to its multiple container shipments...." *Id.* at 517. However, since the court did not specify that the individual requirements of § 6001(a)(3) were established in that case, we are not satisfied, on this record as a whole, that plaintiff has met its burden by merely relying solely on a conclusory statement of the court and presenting absolutely no independent affirmative proof.

Finally, we are concerned by the fact that Omni failed to call two other witnesses, Messrs. Kelly and Garrison. Both men were listed by Omni in its pretrial witness list and scheduled to testify regarding the advice given to Mrs. Kelly. Mr. Kelly was scheduled to testify as to the "ability to have consolidated household goods shipments with shipments of other shippers in order to meet the requirements of the FAK ocean rates in effect on the pegged quotation date for Volume 46." (Plaintiff's Witness List, ¶ 2, filed November 19, 1990). Mr. Garrison was scheduled to testify "regarding the consolidation of shipments for ocean transportation at the time of the Volume 46 procurement." (Plaintiff's Witness List, ¶ 3, filed November 19, 1990). Neither witness was called by plaintiff at trial. Each was scheduled to give testimony of first-hand knowledge that Omni would have been able to meet the SFRA requirements of § 6001(a), including, but not limited to, information as to industry conditions and *as to whether viable service by other carriers was available*, testimony that Mrs. Kelly was unable to give by her own first-hand knowledge (Tr. at 41). In fact, Mrs. Kelly implied by her testimony that both Messrs. Garrison and Kelly were in a better position than she to know prevailing industry rates (Tr. at 35–38 and 49–51).

The fact that plaintiff failed to call either witness, *without explanation* for their unavailability, leads this court to the negative inference that both witnesses would have testified to information which would have been relevant to this element but detrimental to the plaintiff. Unexplained failure to call any known non-hostile person who has direct knowledge of the facts being developed by the party raises the inference that the testimony would be unfavorable or at least would not support the case. *Borror v. Herz,* 666 F.2d 569, 574 (C.C.P.A. 1981); *Culbertson v. Steamer So. Belle,* 59 U.S. (18 How.) 584, 587, 15 L.Ed. 493 (1855). *See Barnett v. United States,* 6 Cl.Ct. 631, 671 (1984); *Hageny v. United States,* 215 Ct.Cl. 412, 570 F.2d 924 (1978); *Kean v. Commissioner,* 469 F.2d 1183, 1187–88 (9th Cir.1972); *Barnett v. United States,* 319 F.2d 340, 344 (8th Cir.1963); *United States v. Fields,* 102 F.2d 535, 537–38 (8th Cir.1939); 2 Wigmore, Evidence § 290(4); *Linkow v. Linkow,* 517 F.2d 1370, 186 USPQ 223 (C.C.P.A.1975); *Alexander v. Blackman,* 26 App.D.C. 541, 550–51, 1906 D.C. 602, 608–09 (1906). The *only* exception to this rule occurs when the testimony of such a witness would be cumulative or inferior to that which is utilized. 2 Wigmore, Evidence § 287. Plaintiff argues that the testimony of Messrs. Kelly and Garrison would have been cumulative. We do not agree. This is so because plaintiff has failed to meet its evidentiary burden *without the testimony of the two witnesses.* Therefore, additional or new evidence of personal knowledge as to operative facts, by definition, could not have been cumulative, at least as to the testimony of one of the witnesses.

We find, therefore, that plaintiff failed to meet its burden of establishing that no viable underlying service at the former rate level was available, *i.e.,* the indispensable element delineated in § 6001(a)(3). Plain-

tiff also failed to establish the government's obligation to make an adjustment under the contract; thus, our inquiry need not continue.[8] Therefore, there was no failure of performance by the government and, consequently, no breach. *Indiana v. United States,* 26 Ct.Cl. at 607; C.J.S. Contracts § 494.

*Conclusion*

Omni was under the burden to establish three substantive requirements contained in § 6001(a) in order to fix the government's obligation to award it the SFRA requested in this action. While able to demonstrate the first two requirements—that Omni's costs increased by more than 2.5%, and that such cost increases occurred after the pegged quotation date—we find that Omni failed on the third prong of its conjunctive evidentiary obligation, *i.e.,* that there was no viable underlying service at the former rate level during Volume 46. Since Omni has failed to meet one of the three conjunctive requirements, it is not entitled to the relief requested. The Clerk shall enter judgment dismissing plaintiff's complaint. No costs.

IT IS SO ORDERED.

## MEMORANDUM ORDER

On March 12, 1993, there was filed, pursuant to Rule 59 [1] of this Court, Plaintiff's Motion For Rehearing And Reconsideration of this court's opinion on the merits filed on February 25, 1993.

In said opinion, the court denied relief to plaintiff on the merits primarily, if not solely, on the grounds that it failed to adduce probative evidence establishing the third conjunctive element under § 6001(a),[2] *i.e.,* "(3) No viable underlying service at the former rate level remains." In said subparagraph, "viable underlying service" is defined as follows:

> (a) Grounds. (1) A ... reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law.... On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

---

8. Plaintiff and defendant submitted detailed arguments as to the appropriate measure of damages to be applied. Inasmuch as the court concludes that plaintiff is not entitled to relief, such a discussion is moot. The court notes, however, that it was not convinced that plaintiff should receive any damages beyond its *actual* increased costs. In this respect, the court agrees with the conclusion of Judge Tidwell in *Four Winds,* 13 Cl.Ct. at 517–18. *See Imperial Van Lines Intern. v. United States,* 821 F.2d 634 (Fed.Cir.1987).

1. Rule 59 (New Trials; Rehearings; Amendment of Judgments; Reconsideration) states in pertinent part as follows:

2. The court found in its opinion that plaintiff satisfied subparagraphs 1 and 2 of § 6001(a), Standing Instructions (Opinion p. 689).

... a minimum of two scheduled sailings per month to or from at least two ports on the CONUS coast concerned (East, Gulf, or West) by U.S. Flag liner service ships with average transit times of no more than 130% of the average scheduled U.S. Flag liner service on the same routes.

## Contentions of the Parties

### A. *Plaintiff*

In its subject motion, plaintiff avers that—(i) "[t]he sole basis for this [motion] is that Court's finding on the third criterion for SFRAs (6001(a)(3)), *viz.*, that Omni did not establish that 'there was no viable underlying service at the former rate level' ... is contrary to the evidence of record and the decision in *Four Winds Forwarding Inc.*" (p. 2); and (ii) that there is no evidence in the record supporting the court's holding on this issue, *supra*, "since the facts on which Omni relies are stipulated by the parties."

### B. *Defendant*

As to this same third element, *i.e.*, "[n]o viable underlying service at the former rate level" and similar to subparagraphs 1 and 2, defendant candidly admits in its opposition to subject motion that "the parties stipulated [to] that [issue]." Notwithstanding said stipulation, defendant contends nevertheless that "this Court should deny Omni's motion for reconsideration ... for the reasons set forth in the Government's motion to dismiss and post-trial brief."

## Discussion

 In its subject motion, plaintiff cites to paragraphs 12 through 17 of Joint Exhibit 34 as the basis for a finding that the parties in fact stipulated to the existence of the third element (¶ 3, § 6001(a), *i.e.*, no viable underlying service at the FAK rate level remains). As noted, *supra*, viable service is defined in § 6001(a)(3) as:

(i) a minimum of two scheduled sailings per month,

(ii) to or from at least two ports on the CONUS coast, and

(iii) by U.S. Flag liner service ships with average transit times of no more than 130% of the average scheduled U.S. Flag liner service on the same routes.

With reference to the sufficiency of proof respecting subparagraph 3, § 6001(a), the court concluded in its opinion "that there is a want of [probative] evidence in the record by the requisite quantum to support a finding that no viable underlying service at the former rate level existed as [specifically] defined [therein]." Stated differently, the court did not find on the then existing record an admission of this fact, *i.e.*, no viable underlying service, in Joint Exhibit 34, because it did not read the literal verbiage in paragraphs 12 through 18 thereof to constitute a stipulation/judicial admission of that indispensable fact as explicitly defined, *supra*. Having reconsidered paragraphs 12 through 18 of Joint Exhibit 34, in the context of the subsequently filed Defendant's Opposition To Plaintiff's Motion For Rehearing And Reconsideration, the court now has a different view of the probative record evidence on this issue. This is so, simply because in its opposition to plaintiff's subject motion, defendant surprisingly and unequivocally agreed and acknowledged that—"*the parties stipulated that no viable underlying service remained at the former rate level*" (emphasis added). Defendant having so stipulated [3] to the existence of the only remaining justiciable factual issue, the court is now constrained to agree with plaintiff that it has now carried its burden by the requisite quantum of proof.[4]

## Conclusion

Given all of the foregoing, the court hereby vacates the following holding in its February 25, 1993 opinion that—"[t]he Clerk shall enter judgment dismissing plaintiff's complaint"—and, instead, finds that defendant is liable to plaintiff to the extent of the difference between the FAK rate(s) included in its bid(s) and the increased costs of underlying transportation *actually incurred* with respect to each of the shipments in issue. *c/o Imperial Van Lines International v. United States*, 9

---

**3.** We find stipulations to be judicial admissions possessing the highest probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, but beyond the power of evidence to controvert them. *Deluxe Check Printers, Inc. v. United States*, 14 Cl.Ct. 782, 784 (1988), citing to *Hill v. FTC*, 124 F.2d 104, 106 (5th Cir.1941).

**4.** In view of defendant's admission, *supra*, the issue of non-mutual offensive collateral estoppel against the government as expressed in *United States v. Mendoza*, 464 U.S. 154, 158–64, 104 S.Ct. 568, 571–74, 78 L.Ed.2d 379 (1984), is now moot.

Cl.Ct. 145 (1985), *aff'd,* 821 F.2d 634 (Fed. Cir.1987), and *Four Winds Forwarding Inc. v. U.S.,* 13 Cl.Ct. 510, 517 (1987). In view thereof, the parties are hereby ordered to confer and stipulate as to the precise dollar amount of all damages to which plaintiff is entitled, consistent with the court's ruling(s). Said stipulation of damages shall be filed with this court within 30 days from the date of this memorandum opinion. Upon receipt of same, the court will direct the Clerk of the Court to enter judgment accordingly.

IT IS SO ORDERED.

